ANDY DOGALI
*Pro Hac Vice to be submitted*
adogali@dogalilaw.com
Dogali Law Group, P.A.
101 E. Kennedy Blvd., Suite 1100
Tampa, Florida  33602
Tel:   (813) 289-0700
Fax:   (813) 289-9435
*Attorneys for Plaintiffs*

EUGENE FELDMAN
California Bar No. 118497
genefeldman@mindspring.com
Eugene Feldman, Attorney at Law, APC
555 Pier Avenue, Suite 4
Hermosa Beach, CA 90254

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

A.L., by and through D.L., as Next
Friend; D.L., Individually;
J.S., by and through D.S., as Next          Civil Action No. _____
Friend, Parent and Natural
Guardian; D.S., Individually;
S.J.K., by and through S.L.K., as Next
Friend, Parent and Court-Appointed
Co-Guardian; S.L.K., Individually;
A.B., by and through M.B., as Next
Friend, Parent and Natural Guardian;
M.B., Individually;
D.H., by and through J.H., as Next
Friend, Parent, and Court-Appointed
Guardian;
J.M., by and through E.M., as Next
Friend, Parent and Natural Guardian;
S.M., by and through E.M., as Next
Friend, Parent and Natural Guardian;
E.M., Individually;

Page 1

*DOGALI LAW GROUP, P.A.*

DOGALI LAW GROUP, P.A.

J.K., by and through R.K., as Next
Friend, Parent and Natural Guardian;
D.M., by and through C.M., as Next
Friend, Parent and Natural Guardian;
C.M., Individually;
J.C., by and through L.C., as Next
Friend, Parent and Natural Guardian;
L.C., Individually;
T.P., by and through S.P., as Next
Friend, Parent and Natural Guardian;
S.P., Individually;
C.M.J., by and through D.L.J., as Next
Friend, Parent and Natural Guardian;
D.M.J., by and through D.L.J., as Next
Friend, Parent and Natural Guardian;
S.G., by and through S.M.G., as Next
Friend, Parent and Natural Guardian;
J.B., by and through K.B., as Next
Friend, Parent and Natural Guardian;
K.B., Individually;
S.H., by and through T.R., as Next
Friend, Parent and Natural Guardian,

     Plaintiffs,

v.

WALT DISNEY PARKS AND RESORTS
US, INC.

     Defendant.

_____/

# COMPLAINT FOR DECLARATORY AND
# INJUNCTIVE RELIEF AND DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

Plaintiffs: A.L., by and through D.L., as Next Friend; D.L., Individually; J.S., by and through D.S., as Next Friend, Parent and Natural Guardian; D.S., Individually; S.J.K., by and through S.L.K., as Next Friend, Parent and Court-Appointed Co-Guardian; S.L.K., Individually; A.B., by and through M.B., as Next Friend, Parent and Natural Guardian; M.B., Individually; D.H., by and through J.H., as Next Friend, Parent, and Court-Appointed Guardian; J.M., by and through E.M., as Next Friend, Parent and Natural Guardian; S.M., by and through E.M., as Next Friend, Parent and Natural Guardian; E.M., Individually; J.K., by and through R.K., as Next Friend, Parent and Natural Guardian; D.M., by and through C.M., as Next Friend, Parent and Natural Guardian; C.M., Individually; J.C., by and through L.C., as Next Friend, Parent and Natural Guardian; L.C., Individually; T.P., by and through S.P., as Next Friend, Parent and Natural Guardian; S.P., Individually; C.M.J., by and through D.L.J., as Next Friend, Parent and Natural Guardian; D.M.J., by and through D.L.J., as Next Friend, Parent and Natural Guardian; S.G., by and through S.M.G., as Next Friend, Parent and Natural Guardian; J.B., by and through K.B., as Next Friend, Parent and Natural Guardian; K.B., Individually; and S.H., by and through T.R., as Next Friend, Parent and Natural Guardian, sue Defendant WALT DISNEY PARKS AND RESORTS US, INC. and allege:

## I.    <u>JURISDICTION AND VENUE</u>

1.    This is an action seeking damages, injunctive relief, and declaratory relief for violations of the Americans with Disabilities Act (42 U.S.C. §12131, *et seq.*) and the Unruh Civil Rights Act (Cal. Civ. Code §51 and §54).

2.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 because one of the actions brought by each Plaintiff arises under federal law.

DOGALI LAW GROUP, P.A.

1  Supplemental jurisdiction over Plaintiffs' state law causes of action is
2  proper in this Court pursuant to 28 U.S.C. §1367.

3.  Defendant WALT DISNEY PARKS AND RESORTS US, INC. ("Disney") is a
Florida corporation which at all material times:

    a.  Has maintained its principal place of business in Orange County,
Florida, is authorized to conduct business in the states of
California and Florida, and is conducting business in Los Angeles
County in the City of Burbank; and

    b.  Owns and operates six themed amusement parks (collectively,
the "Disney Parks"), including Disneyland and Disney's California
Adventure (collectively, "Disneyland") in the Disneyland Resort,
located in Orange County, California, and Magic Kingdom,
Hollywood Studios, Epcot, and Animal Kingdom (collectively,
"Walt Disney World") in the Walt Disney World Resort, located in
Orange County, Florida and Osceola County, Florida.

4.  Venue is proper in this Court pursuant to 28 U.S.C. §1391 because
Defendant maintains corporate managerial business offices within this
District.

## II.    ALLEGATIONS COMMON TO ALL ACTIONS

### A.    The Americans With Disabilities Act

5.  In 1990, the United States Congress made findings that laws were
needed to more fully protect "some 43 million Americans [with] one or
more physical or mental disabilities;" that "historically society has
tended to isolate and segregate individuals with disabilities;" and that
"such forms of discrimination against individuals with disabilities
continue to be a serious and pervasive social problem;" that "the

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous...." 42 U.S.C. § 12101.

6.     42 U.S.C. §12182(a) provides as follows:

*No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.*

7.     42 U.S.C. §12181(7)(B), regarding "public accommodations", provides in pertinent part:

*The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—*
*\* \* \**
*(I)     a park, zoo, **amusement park**, or other place of recreation;*

(Emphasis added.)

8.     42 U.S.C. §12102(1) defines "disability" in pertinent part as follows:

***(1)     Disability***
*The term "disability" means, with respect to an individual—*
***(A)*** *a physical or mental impairment that substantially limits one or more major life activities of such individual;*

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.     For purposes of the "disability" definition, 42 U.S.C. §12102(2) defines "major life activities" thus:

*(A)     In general*
*For purposes of paragraph (1), major life activities include, but are not limited to, **caring for oneself**, **performing manual tasks**, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, **speaking**, breathing, **learning**, **reading**, **concentrating**, **thinking**, **communicating**, and **working**.*

(Emphasis added.)

10.     Title III includes a "General prohibition" against discrimination. 42 U.S.C. §12182(b)(1)(A) provides in pertinent part:

*(i)     Denial of participation*
*It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.*

*(ii)     Participation in unequal benefit*
*It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.*

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

*(iii)   Separate benefit*
*It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.*

11.   Title III further includes a "Specific prohibition" against discrimination. 42 U.S.C. §12182(b)(2)(A)(ii) provides in pertinent part:

*. . . discrimination includes—*

*(ii)   a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.*

## B.   The Unruh Civil Rights Act

12.   §51(b) of the California Civil Code, known as the "Unruh Civil Rights Act" provides protection from discrimination by all business establishments in California, including housing and public accommodations, because of age, ancestry, color, disability, national origin, race, religion, sex and sexual orientation.

DOGALI LAW GROUP, P.A.

13.   Specifically, §51(b) provides that:

> *All persons within the jurisdiction of this State are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.*

> *whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to section 51, is liable for each and every offense.*

14.   §51.5(a) provides in pertinent part that:

> *No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist. . . any person in this state on account of any characteristic listed or defined in subdivision (b) or (c) of §51. . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.*

15.   §51(f) provides that:

> *A violation of the right of any individual under the Americans with Disabilities Act shall also constitute a violation of this section.*

C.   **Facts Common to All Claims**

**1)   The Disney Parks, and Plaintiffs' Cognitive Impairments**

16.   Disneyland, Disney's California Adventure, Magic Kingdom, Hollywood Studios, Epcot and Animal Kingdom are each "public accommodations" under the Americans with Disabilities Act.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17.   Each of the Disney Parks includes motions rides, simulation rides, attractions, shows, parades, costumed character interactions, displays and exhibits, restaurants and eating establishments, and more.

18.   Persons with developmental disorders or cognitive impairments vary widely in the precise manifestations of their impairments.  Generally, a person with a cognitive disability has greater difficulty with one or more types of mental tasks than a person with average cognitive skills, and most cognitive disabilities are the result of a biological or physiological trait of the individual.  The connection between an individual's biology or physiology on the one hand and their mental processes on the other is most obvious in the case of traumatic brain injury and genetic disorders, though less pronounced or more severe cognitive disabilities are often borne in brain structure or chemistry as well. A person with severe cognitive impairment typically needs assistance with all aspects of daily life.  A person with minor cognitive impairment typically needs assistance with some aspects of daily life.

19.   Cognitive disabilities are often classified as either clinical or functional. Clinically diagnosed cognitive disabilities include autism, Down Syndrome, traumatic brain injury, and dementia.  Less severe cognitive conditions include attention deficit disorder (ADD), dyslexia (difficulty reading), dyscalculia (difficulty with math), and other learning disabilities.

20.   Functional cognitive disabilities focus less on the diagnosis of the disability and more on the resulting or special needs, abilities and challenges.  Principal categories of functional cognitive disabilities include deficits or difficulties with: memory, problem solving, attention, reading, language and verbal comprehension, math comprehension, and visual comprehension.

Page 9

21.  Clinical cognitive disabilities typically exhibit one or more of the functional cognitive disabilities.

22.  Each Plaintiff has a developmental disorder and a clinically diagnosed cognitive impairment.  Each plaintiff is substantially limited in his or her ability to care for himself or herself, perform manual tasks, speak, learn, read, concentrate, think, communicate, and work.

23.  Each Plaintiff is an individual who is afforded the protections afforded under the Americans with Disabilities Act.

24.  Because persons with developmental disorders encompassing cognitive disabilities display a wide variety of functional impairments, no single accommodation is available which will invariably satisfy each of their special needs.  Even so, two traits are common throughout the Plaintiffs and, upon information and belief, throughout the entire community of persons with cognitive impairments:

   a.  The disabled Plaintiffs, like other persons with cognitive impairments, are mentally and physically incapable of waiting for significant periods of time in a line or queue.  The idle, unfocused state which necessarily results from standing in a queue causes persons on the autism spectrum, and other near-spectrum exhibitors, to over-stimulate, resulting in meltdown behaviors.  A "meltdown" is an episode familiar to those who care for autistic and other cognitively-impaired persons.  Most commonly, the autistic person, when required to stand idle for more than a few minutes or indefinitely, will begin to increasingly exhibit their individual form of "stimming," which is a tic or tendency which can take the form of humming sounds, random noises, striking out, swinging arms, hitting oneself, or flailing wildly.  A meltdown within a Disney queue is an awkward and uncomfortable

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

experience for those in the immediate vicinity, can be hazardous to the disabled person and bystanders, and can be humiliating and embarrassing for the disabled person and his or her companions. Invariably, requiring the person to stand in a queue for many minutes will induce meltdowns in the large majority of persons with cognitive impairments, including all of the disabled Plaintiffs.

b.  The disabled Plaintiffs, like other persons with cognitive impairments, are mentally and physically incapable of traveling across a park to the site of an attraction only to be told to come back later. Explaining the disruption would be as impracticable as re-programming a computer in the middle of its computation, or placing food in front of someone with no sense of present versus future tense and telling them not to eat it now but to wait until later. Invariably, this experience will induce meltdowns in the large majority of persons with cognitive impairments, including the disabled Plaintiffs.

**2)    The Guest Assistance Card: Disney's Commendable Accommodation of Plaintiffs, Pre-October 2013**

25.  Each Plaintiff visited one or more of the Disney theme parks on multiple occasions prior to October of 2013. Generally, on those occasions, Disney adopted and followed systems, policies and procedures which wonderfully accommodated Plaintiffs' special needs.

26.  Visits to the Disney Parks became among the most, if not the most, joyous and eagerly anticipated experiences in Plaintiffs' lives. The Plaintiff parents and guardians uniformly acknowledge that, prior to about October 9, 2013, taking their child to the Disney Parks was one of the few experiences, if not the only experience, which would bring

obvious joy to their disabled child for many hours in a row, a notion very uncommon outside Disney's magical worlds.

27.   The experience of visiting the Disney Parks may have been more uniquely entertaining for the disabled Plaintiffs because of their limited ability to participate in other ordinary experiences.  For the most part, the disabled Plaintiffs and other persons with cognitive impairments cannot go to birthday parties, they cannot play on baseball teams, they cannot go fishing or bowling, they cannot go to church.  Absent other joyful experiences, the terrific product Disney developed and admirably delivered gave great hope and anticipation to Plaintiffs and their families.

28.   Prior to October of 2013, Disney's system for accommodating disabled persons' special needs was universally enjoyed and appreciated by the community of persons touched by cognitive impairments.  The system was known as the "Guest Assistance Card" ("GAC").  A redacted example of a Guest Assistance Card which was used at the Walt Disney World Resort is attached as Exhibit 1, and a redacted example of a Guest Assistance Card which was used at the Disneyland Resort is attached as Exhibit 2.  With the Guest Assistance Card, though guests were not always expressly promised immediate access to the attractions, immediate access was precisely what Disney, through its employees, routinely delivered.  The disabled Plaintiffs' caretakers knew they could rely upon immediate access when they visited the Disney Parks.  Disney would not make them travel all the way to an attraction only to be told to leave and come back later; Disney did not make them wait in a line for more than a few minutes.  Very little risk of over-stimulation or meltdown ever arose.

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

29.     In addition, the Disney Parks' employees always appeared to have been trained to care about Plaintiffs' special needs.  Actually, the employees were so talented in this role that it did not appear they had to be trained to care; it appeared they simply did care, naturally.  They never did anything which was designed or prone to inflict embarrassment or shame or humiliation upon the disabled guest and his or her companions.

    **3)     The Disability Access Service: Disney's Failed Accommodation of Plaintiffs Commencing October 9, 2013**

30.     On or about October 9, 2013, Disney revoked the Guest Assistance Card program and its related systems, policies and procedures for accommodating Plaintiffs' special needs.  Disney replaced the Guest Assistance Card program with a set of company-wide systems, policies and procedures which were connected to the new "Disability Access Service" ("DAS") card.  A redacted example of a Disability Access Service card is attached as Exhibit 3.

31.     Even before Disney began the research and development program which culminated in the DAS card, Disney possessed a sophisticated level of knowledge of the difficulties and special needs of persons with developmental disorders and cognitive impairments.  Disney then engaged in research and development of the DAS card system for more than four years before unveiling it to the dismay of the disabled community.  Disney's knowledge is so extensive, and Disney's new Disability Access Service is so obviously discriminatory and so outrageously contrary to Disney's own knowledge of such guests' special needs, that it is inconceivable that the Disability Access Service's discriminatory impact upon Plaintiffs is an accident.

Page 13

1    32.    The systems, policies and procedures associated with the Disability
2           Access Service which Disney rolled out in October of 2013 were certain
3           to create discrimination against Plaintiffs, and it was obvious that the
4           community of persons with cognitive impairments would be harmed by
5           the DAS.
6    33.    Disney has come to disfavor the presence of Plaintiffs in its theme parks
7           because:
8           a.    Plaintiffs' disabilities include a propensity to occasionally behave
9                 loudly and irrationally in public. Disney disfavors such episodes
10                because they upset the Disney "magic" being otherwise
11                experienced by Disney's nearby non-disabled guests.
12          b.    Disney previously accommodated Plaintiffs by permitting the
13                disabled person and his or her companions to enter its rides and
14                attractions without enduring idle wait times. Disney especially
15                disfavored doing so for those Plaintiffs who are purely autistic
16                and who do not exhibit some other physical disorder – i.e., those
17                who present the "invisible disability" of autism. With persons
18                presenting obvious, visible disabilities, such as persons in
19                wheelchairs, the nearby guests could see that the guest's special
20                need was being accommodated. For autistic guests, the disability
21                is often not apparent, leading nearby Disney guests to conclude
22                that the person was being allowed to promptly enter the ride for
23                reasons relating to preferential favoritism and not to disability
24                accommodation. Disney has always desired to curb the
25                resentment harbored by nearby non-disabled guests who wait in
26                Disney's infamously long queues.
27   34.    Either by design or as a collateral benefit from Disney's perspective,
28          Disney's new system takes steps to end both of these Disney-perceived

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

1
2
3
4
5

problems.   Overtly discriminating against Plaintiffs and others like them until persons with autism and other developmental disorders simply no longer visit Disney's theme parks will likely end any potential disruption of the "magical" Disney experience enjoyed by Disney's non-disabled guests.

6
7
8
9
10
11

35.   Either Disney designed the DAS with a goal or "benefit" in mind of substantially reducing the number of autistic and cognitively impaired persons who visit the Disney Parks, or Disney recognized such "benefit" promptly upon release of the DAS and has accepted its adverse impact upon Plaintiffs.   Manifestations of this motivation or acceptance include:

DOGALI LAW GROUP, P.A.

12
13
14
15
16
17
18
19
20
21
22

a.   Disney's employees, who previously exhibited only the highest care and attention for Plaintiffs during their visits to the parks, turned overnight into a terrible new version of themselves. Disney's employees uniformly reversed all of their prior characteristics; courtesy was replaced with rudeness, acceptance with suspicion, understanding with impatience, consideration with discourtesy.  The switch from respect for Plaintiffs' needs to disdain for Plaintiffs' presence was so broad, and so consistent, and so immediate, that Disney clearly trained its personnel to engage in behavior that is calculated to deter Plaintiffs from ever returning to the Parks in the future.

23
24
25
26
27
28

b.   Plaintiffs and persons like them frequently visit the parks and other public accommodations bearing proof of their disability and/or special need, often in the form of medical documentation. Until October of 2013, Disney's Guest Relations employees were trained to deem such information irrelevant; when Plaintiffs and others like them offered such information for review, the Disney

DOGALI LAW GROUP, P.A.

employees courteously indicated the information was unnecessary. This was true because, if for no other reason, the Americans with Disabilities Act and regulations implementing it prevented further inquiry into the nature of the disability. But the Disney employees did not avoid all discussion of a guest's special need, especially where a guest wanted to volunteer information for the purpose of explaining a need and inquiring about a potential modification to Disney's practices. Commencing with the DAS, Disney personnel give a subtle but distinctly different response to any offers of information: the employee advises that he or she has been "instructed not to review" the information. The difference in message creates the result of avoiding all discussion of any guest's special need, in favor of treating all disabled guests the same. By insisting upon treating all disabled guests the same, Disney systemically refuses to consider individualized modifications of its procedures to accommodate any individual's special need.

c.    The DAS card itself reveals Disney's motivations:

1)    Disney replaced its generically-titled "Guest Assistance Card" with the stigma-emphasizing title of "_Disability_ Access Service" card. There can be no plausible good faith reason for deliberately re-naming the card in this manner.

2)    Disney now insists upon taking a photograph of the disabled guest at the commencement of each two-week period the guest visits the Disney Parks. Non-disabled persons are not required to submit to the taking of their photograph. There can be no plausible good faith reason

1    for adding this pre-condition to disabled persons' entry to

2    the Disney Parks.

3    3)    The card expressly cites its purpose as follows:

5    *The Disability Access Service is designed for Guests who*
    *are unable to tolerate extended waits due to disability.*
6    *This service allows Guests to schedule a return time*
    *that is comparable to the current queue wait for the*
7    *given attraction.*

8

9    *This service does not provide immediate or priority*
    *attraction access.*
10

11

12    Disney cannot possibly miss the facial incongruity in this

13    language.  The first sentence purports to help the Plaintiffs

14    avoid waits, while the second sentence institutionally

15    mandates waits.  A "return time" equal to other patrons'

16    "current queue wait" ***is*** a wait.  And, for the Disney Parks, it

17    is definitively a ***long*** wait.  Disney's biggest obstacle to

18    providing a perfect outing for all its guests is its notoriously

19    long wait times.  One-hour wait times are the norm.  The

20    primary difference for non-disabled patrons is that they

21    can tolerate and withstand the dreaded wait times, while

22    Plaintiffs cannot.    In the third sentence, Disney

23    acknowledges the difference between immediate access

24    and priority access; that is, immediate access is not

25    necessarily preferential or superior treatment in

26    comparison to the access afforded other guests.  Even if

27    Plaintiffs have a special need for near-immediate access,

28    they have never sought, and do not seek, "priority" access.

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4)   The first and last of the "Terms and Conditions" of the DAS Card are:

*Your scheduled return time does not provide immediate access upon your return.*

*When utilizing this service, it is possible to experience waits greater than the posted wait time.*

Disney cannot in good faith miss the incongruity of these provisions.   To suggest that the disabled guest must schedule an appointment for a ride, for whatever time in the future would be the start or boarding time if the guest were to stand in line, while not promising to let the guest onto the ride at the appointment time, is outlandish. Disney mandates the making of an appointment time but refuses to commit to honoring the appointment time.   By doing so, Disney refuses to commit to providing an accommodation.   Plaintiffs do not control and cannot predict whatever variables may exist to influence Disney's decision to accommodate a guest by honoring a promised wait time. The second sentence establishes that even if the DAS is followed, other, non-disabled guests may receive more favorable service.

5)   The very cover of the DAS card gives the disabled guest this instruction:

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

*At each attraction, please show this card to an attraction Cast Member to notify them of your assistance needs. They will assign a return time based on the current wait.*

*When available, please use Disney FASTPASS® service to reduce your wait time.*

This language constitutes an admission that Disney will not, under any circumstances, eliminate or reduce a wait time.  The first sentence invites a discussion of a guest's special needs.  The second sentence establishes that no matter what special need the disabled guest may want to discuss, one and only one accommodation will be offered, and it is to wait as long as a non-disabled guest waits.   (Or, given Disney's lack of commitment to honoring a promised return time, perhaps even longer.)  The third sentence confirms that, under any circumstances, the disabled person will experience an extended wait, because he or she is encouraged to take other measures to reduce the wait time.

36.   When Disney unleashed the DAS system on its unsuspecting disabled fans, Disney publicly announced that only the highest-functioning persons would be accommodated by the DAS system and that others would be accommodated based upon their individual special needs. Disney knew, as admitted by Mark Jones, Disney's Manager of Domestic Services for Guests with Disabilities, that other autistic persons and other persons with cognitive impairments would require individualized attention in order to accommodate their special needs.   However, Disney expressly trained its Guest Relations employees not to

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

acknowledge any individual special needs and not to provide any individualized accommodations.  As the DAS card provides on its cover, no matter what the special need, the "accommodation" is the same.

37.  On March 27, 2014, the United States Centers for Disease Control and Prevention released a report concluding that in 2010, one of every 68 American children was identified as autistic, an increase of 30% in two years.  Disney, as one of the world's premier providers of goods and services for children, does not miss such demographics and trends.

38.  Disney knew the DAS would be universally despised by guests with cognitive disabilities, because the system would not accommodate their special needs.

39.  The entire DAS is predicated upon the concept that Disney will accommodate Plaintiffs, not by relieving them of the burden of _waiting_, but by relieving them of the burden of waiting _in lines_.  However, without exception, when each Plaintiff who has visited the Parks since October 9, 2013 arrived at the Parks, he or she reported as required by Disney to Guest Relations, and was immediately met with an extended wait, _in line_, _just to obtain the DAS card_.  Disney is too smart to genuinely believe that it reasonably accommodates disabled persons by making them wait in lines as a precondition of being relieved of the burden of waiting in lines.

40.  Disney knows the DAS makes the wait time of disabled persons even _longer_ than the notorious wait times which non-disabled persons are already required to endure in the Parks.  When the wait time associated with reporting to Guest Relations to complete the stigmatizing procedure of having a photograph taken, a procedure not required of non-disabled persons, is added to the assigned and designated wait time for any particular ride, the disabled person's wait is, by definition,

Page 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

*longer* than the non-disabled person's wait time.  If a disabled person waits one hour at Guest Relations to obtain the DAS card, then complies with the DAS and rides one ride which has a one-hour wait time, the disabled person's wait time is two hours, while the non-disabled person's wait time is only one hour.  If the disabled person rides five rides, each with a one-hour wait time, the disabled person's wait time is 12 minutes longer per ride than the non-disabled person's wait time.

41.   Disney's Disability Access Service systematically builds in still another mechanism for ensuring that disabled persons spend *more* time waiting than non-disabled persons, and that they do so *in lines*.  Under Disney's prior Guest Assistance Card program, the guest obtained a card which was effective for the succeeding 14 days with no further administration or hassle.   But under the new DAS, anything resembling an accommodation beyond the baseline DAS, such as a single Fast Pass, is a "one-time only" accommodation, and it is only provided to those who push back against Disney in the futile effort to make Disney's employees, who have been trained not to listen, understand that the DAS does not accommodate persons with cognitive impairments.  For this reason, the disabled guest must report to Guest Relations *every day* upon entry into one of the Parks.  The disabled guest must then repeat the first day's one-hour wait in the Guest Relations line, all for the privilege of repeating the prior day's complaints in vain, hoping that someone will listen or that someone will provide something in addition to the DAS which, standing alone, is nothing.  There can be no good faith reason for Disney to require families in which someone has a developmental disorder or cognitive impairment to begin their day in such an unpleasant fashion.

**4)** **The Disability Access Card: A Contrived Solution to a Non-Existent Problem**

42.   Beginning in approximately May of 2013, public news and media outlets reported that Disney was suffering from a problem of "rented invalids."  Reportedly, persons were fraudulently arranging to become companions of disabled persons they otherwise did not know, purely to skip the queues for immediate entry into Disney attractions and rides.

43.   The news pieces, which suddenly appeared and focused on a problem which had apparently gone unnoticed for decades, seemed to spread virally.

44.   The "rented invalid" problem never existed to any extent which necessitated a massive overhaul of Disney's policies for accommodating disabled persons.  Rather, Disney influenced the release and/or spread of such articles, for the specific purpose of creating cover for its planned rollout of the DAS program.  Disney wanted the public to view the "rented invalid" problem as an epidemic of fraud, with Disney as its victim.

45.   One facet of the DAS is that guests with mobility challenges are removed entirely from the DAS system.  Disney now refuses to even acknowledge that persons in wheelchairs are disabled.  Guests with wheelchairs are now told that the queues are fully accessible for them so they may wait in lines with the non-disabled persons.  Even if the so-called "rented invalid" problem ever really existed, once Disney removed mobility-challenged guests from the DAS, the problem was solved.  The systemic abuse about which Disney became suddenly frantic in 2013 could never be carried out by or with persons with developmental disorders or cognitive impairments.  If there was a problem with non-disabled guests "renting" persons in wheelchairs for

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

a day, the problem could not occur with persons like Plaintiffs.  No fake companion would "rent" an autistic guest for a day in the Parks, because the eccentricities of the disabled person's visit to the Parks would render the day completely unpleasant for the fake companion. Autistic persons are mentally and physically incapable of browsing or wandering randomly looking for an attraction that might be inviting. Like Plaintiff A.L., many must follow the same pattern through the Parks, every time, riding the same rides, in the same order, every time. Or like Plaintiff J.S., they must ride the same ride, over and over, for several hours at a time.  They do not stop for casual dining, or to rest, or for shopping or picture-taking.  They cannot honor the schedule or priorities of their companions.  Their day does not resemble a day anyone who would "rent" them might want.  By completely eliminating persons with mobility challenges from the DAS and making those disabled persons wait in queues, Disney eliminated the epidemic it wants the public to believe existed.  There was no longer a reason to roll out the DAS at all.

46.   Disney's cited justification for abandoning Plaintiffs' right of equal access to Disney's facilities:  "[The GAC] had been abused and exploited to such an extent that we were no longer able to sustain the program" is simply meritless.   The so-called problem of widespread abuse of Disney's accommodations never existed, and never could have existed, in connection with Plaintiffs.

**5)**   **DAS Disinformation: Disney Places Outrageous and Insulting Videos on the Web for Its own Spin Control Benefit**

47.   Public blogs and social networking websites are a very common form of communication within the autistic community.  Since October of 2013,

1   those sites have consistently shown how widely and acutely despised
2   Disney's new form of "accommodation" is.

3   48.   Fearing for its own reputation within the highly profitable non-disabled
4   community, Disney arranges for messages to be posted on such
5   websites, without acknowledging Disney's sponsorship, of well-
6   scripted positive messages which are actually from Disney employees
7   or agents.

8   49.   Disney has sponsored, without attribution or acknowledgement,
9   numerous videos on the internet which are wickedly contrary to
10   everything Disney knows about cognitive impairments.  There can be
11   no good faith reason for sponsoring false messages.  These videos are
12   designed to induce the non-disabled community to believe that Disney
13   is really trying to accommodate persons with cognitive impairments.
14   For viewers within the disabled community, the videos are even worse
15   because they _blame the autistic person_ for their own failures to
16   appreciate Disney's Parks.  They go so far as to propose that the reason
17   an autistic person cannot tolerate a ridiculous queue time is their own
18   lack of effort or control; they can self-teach themselves to handle such
19   environments, and if they were to simply try harder, they would see
20   that one-hour waits are just fine.  In October 2013 a video appeared
21   advising parents of children with developmental disorders to have
22   their child practice waiting before visiting the park.  Disney knew
23   disabled Plaintiffs are incapable of waiting in long lines without melting
24   down yet treated the harm caused by waiting as if it were a skill which
25   could be acquired with repetition.

26   50.   Disney knows that viewers of these messages who are part of the
27   disabled community or who have any true understanding of cognitive
28   impairments will be insulted and disgusted, because Disney is too

DOGALI LAW GROUP, P.A.

Page 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

smart to be delivering such inane messages in good faith, just as Disney is too smart to genuinely believe autistic persons can go all the way to a ride and calmly and peaceably accept an instruction to come back later. Disney also knows that it is very common for disabled persons to visit the Parks with only one parent companion – this is particularly common for autistic children who live in the vicinity of the Parks and visit more frequently using annual or extended passes.  A single parent accompanying an autistic child cannot leave the child alone or with another person; there is no choice but to take the child all the way to the ride only to have the child learn that he or she is prohibited from riding it.  More aptly, the child will be told he or she is prohibited from riding the ride "at this time," but the temporal portion of the prohibition is too complicated for the child to understand.

51.   Illicitly-supported videos are not designed to actually aid persons with cognitive impairments or their caretakers.   Disney is too knowledgeable to propose that an instructional video could ever meaningfully teach or encourage persons with cognitive impairments to "practice waiting in line," or to "browse in the stores" during the wait time,  or to similarly kill time by using the restroom or having a snack.

52.   These messages, posts and videos are not designed for their stated audience, which Disney knows will know better.  They are designed only to cover Disney's reputation in the non-disabled community, in case any of the disabled community's widespread despair about the DAS system should spill over to the non-disabled community.

**6)   <u>Feigned Accommodation: Inconsistently Doling Out Occasional Ride Passes to Quiet Complaining Guests</u>**

53.   Upon creating and implementing a system that was destined to create horrible experiences for persons with cognitive impairments, with the

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

result of deterring persons with cognitive impairments from visiting the Parks, Disney further trained its Guest Relations employees that these guests were likely to complain about their experiences and about the new system's total failure to accommodate their special needs.  The employees were instructed to tolerate whatever resistance they could, and when absolutely unavoidable, the employees could consult with a supervisor, and upon receiving approval, give up to three immediate-access, no-appointment ride entry passes to the guest.  Even during the first few months of the system, the Guest Relations employees arbitrarily and capriciously extended these passes to Plaintiffs. Occasionally the employees granted three passes; sometimes two. Other times the employees advised that they could provide no passes at all and could only provide the DAS card and nothing more, because Disney policy firmly prohibits any accommodation beyond that afforded by the DAS card.  Even when two or three passes were extended, some Plaintiffs were advised that Disney policy firmly provides that no further passes could or would be made available that day.  Others were advised that more passes would be made available that day, but only if the guest were to return to Guest Relations to obtain them, which the employees know is unworkable because returning to Guest Relations would be contrary to Plaintiffs' special needs.   Some Plaintiffs were even told at one Disney Park that additional passes were available as an accommodation beyond the DAS card, while being told on the next day, at a different park during the same visit to the Walt Disney World resort, that Disney's new DAS policy strictly prohibits the granting of such passes.

54.     Disney's new policy of inconsistently, arbitrarily and capriciously granting additional passes only when a guest loudly complains, creates

DOGALI LAW GROUP, P.A.

complete unpredictability for families in which someone has a developmental disorder or cognitive impairment.  Disney knows this arbitrariness will further deter families in which someone has a developmental disability or cognitive impairment from visiting the Parks.  If the families cannot rely upon Disney and its employees to graciously, caringly and empathetically accommodate disabled persons' special needs as Disney always previously did, the families will not risk the disabled person's calmness and stability by visiting the Parks.  Guests living more than a day-trip away will not risk the investment of an extended vacation.

55. Disney's arbitrariness is also destined to deter further visits to the Parks because Plaintiffs and similarly-situated guests simply do not welcome the notion of having to start each day in the Parks by reporting to Guest Relations and becoming a complainer, with the hope of obtaining some meaningful accommodation such as Fast Passes.  Starting the day so unpleasantly is the antithesis of any person's anticipated day in one of the Parks.

56. Families in which someone has a cognitive impairment are well-connected in web groups and social networking communities.  Some of those discussion outlets are Disney-specific and are monitored by Disney, either openly or secretly.  Disney expected the word to quickly get out within those virtual communities that Disney no longer meaningfully accommodates persons with cognitive impairments.

57. Disney's systemic arbitrariness continued into January of 2014.  After three months of discriminating against persons with cognitive impairments and providing only the pretense accommodation described above to those who complained, Disney began uniformly announcing to families in which a guest has a cognitive impairment that

Page 27

1  even the passes that Disney had been inconsistently, arbitrarily and
2  capriciously doling out to complaining guests were no longer available
3  at all.   No accommodation beyond the DAS card would be made
4  available to anyone.

5  58.  Disney can of course readily modify the DAS or roll out alternate
6  procedures which would accommodate Plaintiffs' needs, with no
7  alteration in Disney's way of doing business.  The best indicators of this
8  simple feasibility include:

   a.  Even before ADA existed – even before Disney had an express
       statutory obligation to accommodate disabled persons – Disney
       accommodated disabled persons, admirably.

   b.  When ADA was passed and for more than 20 years thereafter,
       Disney admirably accommodated the needs of guests with
       developmental disorders and cognitive impairments.

   c.  Even after conjuring up the DAS, Disney created a Magic List
       concept.  Disney refuses to publicize its Magic List, lest it actually
       become widely known within the autistic community.

   d.  At about the same time that Disney rolled out the DAS, or shortly
       thereafter, Disney started a test release of its Magic Band
       product, which enables rides to be scheduled by appointment.
       The band could easily be programmed to allow the disabled
       wearer prompt access to all rides, or to specific rides.  Disney
       refuses to make Magic Bands available to persons outside those
       staying in the Disney resorts.

       **7)**   **A Secret Accommodation, Unknown to Disabled Guests,
                is No Accommodation at All**

59.  After months of systemically-designed unpredictability, followed by the
     total predictability of no accommodation at all beyond Disney's

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

impossible one-accommodation-fits-all DAS, Disney began inconsistently, arbitrarily and capriciously doling out still another occasional accommodation, internally known as the "Magic List." The Magic List is a secret list of persons to whom Disney will automatically extend, without the stigma of a "Disability" card, and without a mandatory photograph, and without the newly-ingrained disrespect of Disney employees, five immediate-entry, no-appointment ride passes.

60.    The Magic List does not perfectly accommodate the special needs of all persons with cognitive impairments, but it is considerably better than the recklessly inadequate DAS card.

61.    Disney is withholding the existence of the "Magic List" from the broader community of families in which someone has a cognitive impairment. By doing so, Disney continues to deter families from visiting the Parks or making plans to do so.  Families of persons with developmental disabilities or cognitive impairments remain unwilling to return to the Parks, in fear that the disabled person will experience otherwise avoidable meltdowns and otherwise be subjected to discrimination and humiliation in the Parks.  If the accommodation to be provided to persons on the Magic List were refined, and if the Magic List were made known to disabled persons and their families to allow them to predict their likely experience prior to incurring the risk and investment of traveling to the Parks, this deterrence would be substantially reduced or eliminated.

### 8)    Disney has Demonstrated Callous Disregard for the Rights of Plaintiffs, Each of Whom has a Developmental Disorder

62.    As alleged above, Disney possesses sophisticated knowledge of the special needs of persons with cognitive impairments.  Disney did not

DOGALI LAW GROUP, P.A.

1    accidentally roll out a system which is so distinctly inconsistent with
2    the special needs of such persons.   Disney did so intentionally or
3    recklessly, to cleanse its Parks of what Disney views as the anti-Magic
4    of such persons' stimming, tics, and meltdowns, or subsequently
5    intentionally or recklessly accepted the damage to Plaintiffs as a benefit
6    to Disney.

7    63.   In connection with the planning and implementation of the DAS,
8          Disney:

9    •    Spent years designing a system which is wholly inconsistent with
10        Disney's own sophisticated knowledge base about persons with
11        cognitive impairments;

12   •    Disseminated false information about a problem which never
13        existed to any meaningful extent, and which never existed to _any_
14        extent for persons with cognitive impairments, to gain cover for its
15        planned unveiling of a harshly discriminatory program;

16   •    Implemented a new accommodations system which wholly
17        eliminated accommodations for guests with mobility impairments,
18        thus erasing the problem which Disney had contrived as cover; there
19        remained no epidemic for Disney to "cure" by creating a new
20        accommodations program for persons with cognitive impairments,
21        who were never part of the now-eliminated problem;

22   •    Unleashed the DAS system, to the entirely predictable dismay of the
23        community of families which include persons with cognitive
24        impairments;

25   •    Caused or allowed families in which a person has a cognitive
26        impairment to suffer horribly unpleasant visits to Disney's Parks for
27        several months, with knowledge that such experiences would

28

become widely known and would deter other such families from bringing their visible "non-Magic" into the Parks in the future;

- Trained its employees to adopt positions toward guests with cognitive impairments which involve offering feigned accommodations which were destined to be soundly rejected, predictably creating a newly disrespectful and unkind attitude not previously exhibited by Disney's employees;

- Inconsistently, arbitrarily and capriciously provided "one-time only" additional accommodations only to families who complained loud enough, and even then only to an extent which was not genuinely designed to accommodate the guests' special needs.  The principal purpose for these arbitrary "one-time only accommodations" was simply to give Disney's employees something to ameliorate their own unkind treatment of disabled persons, and to allow the employees to quiet the loudest complainers;

- Kept a secret "Magic List" of persons Disney is willing to accommodate, without disseminating information about the existence of the list, and without advising the public as to the criteria which is being used by Disney to exclude many disabled persons from the Magic List while making it available to others;

- Made plans to officially roll out a new technology which could be used to accommodate Plaintiffs' special needs only after Plaintiffs and others like them have been deterred from visiting the Parks;

- Systemically refuses to communicate with guests about their accessibility needs, to avoid addressing any possible modifications to Disney's plans and procedures which might accommodate such needs.

DOGALI LAW GROUP, P.A.

64. Disney maliciously caused injury to Plaintiffs, discriminating against them in the short term with the expectation or known consequence of deterring them and other similarly-situated persons from visiting the Disney Parks in the long term.

65. Disney cruelly and oppressively subjected Plaintiffs to discrimination for no defensible, honorable purpose.

66. Disney fraudulently disseminated or encouraged the dissemination of false information, for the purpose of creating cover to prevent discovery or public discussion of its scheme.

67. As a result of Disney's malice, oppression and fraudulent conduct, all in willful and conscious disregard of Plaintiffs' rights, and pursuant to §3294 of the California Civil Code, Disney must be punished.  Punitive damages, if assessed here, would create an example for large corporations which set out to sell out entire groups of disabled persons simply because the company views those persons as blemishes against the company's own self-image.

### Attorneys Fees and Litigation Expenses

68. As a result of Disney's callous discrimination and violations of the Americans with Disabilities Act, Plaintiffs have been required to retain the services of undersigned counsel.  Plaintiffs have agreed to pay undersigned counsel a reasonable attorneys' fee and have agreed to reimburse the attorneys' reasonably-incurred litigation expenses. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs in filing this action, pursuant to 42 U.S.C.A. Section 12205.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

## COUNT 1

### Violation of the Americans with Disabilities Act

### 42 U.S.C. §§12131, *et seq.*

### *A.L. v. Disney*

69. Plaintiff A.L. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

70. A.L. has autism.

71. A.L. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

72. A.L. is 22 years of age and is generally in the care of his mother, D.L., who brings this action as A.L.'s next friend.

73. A.L and D.L are residents of Orange County, Florida.

74. For many years leading up to October of 2013, from the time A.L. was a small boy, A.L. and D.L. visited the Walt Disney World Parks dozens of times.  During those visits, A.L. exhibited a nature and extent of joy that he rarely showed in any other setting.  D.L. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere.

75. A.L.'s cognitive impairments manifest themselves in a certain way during his visits to the parks; A.L. is incapable of deviating from consistency, order and routine.  Upon entering the Parks, A.L. can travel in only one direction, stopping at only the same places, in the same order, every time.

76. About a week before Disney subjected guests with cognitive impairments to the DAS, Disney executive Mark Jones called D.L. to discuss the new system.  D.L. knew immediately, based only upon Jones' representations of how the system would supposedly operate, that the

system would not work – it simply would not accommodate the special needs of persons with cognitive impairments.  Jones acknowledged that the baseline DAS system would not work for all.   Shockingly, he proposed that it would work for 90% of all persons with cognitive impairments, and that only a few would require individualized care and accommodation.

77.   The individualized care which Jones indicated would be provided was never actually made available to A.L. and D.L. in the Parks.  On each occasion that D.L. attempted to explain A.L.'s special need to Disney personnel, Disney personnel insisted that the four corners of the DAS was all the accommodation that could be made available.   Not only were A.L.'s needs not supported, they were ignored.

78.   During their first visit to Magic Kingdom following rollout of the DAS system, D.L. reported as required to Guest Relations.   Ironically, she was required to wait in line for nearly one hour to gain access to the DAS card procedure, the purpose of which is to avoid lines.

79.   When this wait finally ended, D.L. explained to Disney personnel that A.L. can only visit the Park in one precise order.   And that he is incapable of traveling all the way to a ride only to be turned away and told to come back later.

80.   Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate A.L.'s special needs, Disney personnel now offered bizarre and preposterous responses to D.L.'s recitations regarding A.L.'s needs.   Their statements were so contrary to Disney's body of knowledge and to Disney's historic performance that Disney cannot have accidentally proposed such absurdities.   For example, Disney personnel simply ignored A.L.'s inability to experience Magic

DOGALI LAW GROUP, P.A.

Page 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

Kingdom in anything except one pre-defined order, and tried to offer, or pretended to try to offer, alternate routes with which A.L. might experience the Park.  Any such suggestion is wholly contrary to any reasoned understanding of the needs of autistic persons, and reflects a naiveté about the special needs of persons with cognitive impairments which is thoroughly inconsistent with Disney's own historic understanding.  Generally, autistic persons cannot browse; they cannot impulsively enjoy substitute experiences; they cannot "kill time."  And Disney knows this.  Disney has known this for years.

81.    Even after being told of the assurances which Jones gave to D.L., the Disney Guest Relations employee repeated that the DAS card system is "all that Disney can offer" to a guest like A.L.

82.    At one point a Disney employee had the audacity to suggest that the family "split up" to experience the Parks.    Again, Disney has a sophisticated knowledge of autism.  Disney certainly knows that 85% of marriages among parents of a cognitively impaired child end in divorce.  Suggesting that they enjoy the Parks separately is outlandish.

83.    Only after D.L. persisted in her resolve to obtain accommodation for A.L. did Disney provide anything more.  Disney provided a few fast passes, along with the DAS card.  During all these discussions with Disney personnel, the Disney employees displayed a terribly uncaring and unsympathetic attitude and approach.  For the first time in A.L.'s life, the Disney employees made the experience a miserable one.

84.    D.L. and A.L. left Guest Relations and went to the first ride in A.L.'s order – the Jungle Cruise.  The wait was 40 minutes, which A.L. cannot withstand.  The idea of leaving and coming back in 40 minutes was preposterous.  So A.L. and D.L. and their other family members used the Fast Passes to enjoy the ride without waiting.  The family then feared

1   continuing on A.L.'s pre-ordained "route" because A.L. would need to

2   finish it, and with only three Fast Passes left, the family would not be

3   able to avoid a meltdown.  Having no option, they left the park, after

4   experiencing one attraction.

5   85.   Like most parents of autistic children, D.L. knows her child's stimming,

6   tics, and tendencies.   She knows the stimuli that are likely to

7   overwhelm him.  And she does not permit these stimuli to overwhelm

8   him – no parent will permit a child to experience a meltdown if such

9   can be avoided.

10   86.   D.L. subsequently communicated with Disney personnel in an effort to

11   cooperate with Disney and achieve a truly accommodating openness.

12   Disney personnel showed no willingness or desire to improve the

13   experience for guests like A.L.

14   87.   D.L. incurred monetary costs in purchasing tickets to the Parks for trips

15   that were entirely wasted, and incurred other expenses during the

16   wasted trips to the Parks.

17   88.   A.L. and D.L. have already visited the Parks considerably less frequently

18   than they did in the past, a situation which continues to this day.  Their

19   interest in attending Disney Parks is substantially reduced.  They will

20   not attend the Parks in the future due to their expectation that the

21   experience will again be a supremely un-accommodating one.

22   WHEREFORE, Plaintiff A.L., by and through D.L. as his next friend,

23   parent and natural guardian, prays that this Court adjudicate this dispute and

24   enter an Order:

25   •   Enjoining Defendant to cease the practices which are causing

26   discrimination against Plaintiff on account of A.L.'s disability; and

27   •   Enjoining Defendant to reasonably modify its policies, practices, and

28   procedures to afford Plaintiff with an opportunity to experience

DOGALI LAW GROUP, P.A.

Page 36

Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

## COUNT 2
### Breach of Contract
### *D.L. v. Disney*

89.  Plaintiff D.L. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 70 through 88 above.

90.  D.L., through D.L.'s acquisition of Disney tickets for D.L. and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

91.   Disney failed or refused to provide the promised experience, and is in breach of contract.

92.   D.L. incurred monetary costs in purchasing tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff D.L. prays that this Court adjudicate this dispute and enter an Order:

• Finding that Disney breached its contract with D.L.; and

• Entering judgment for Plaintiff D.L. in the amount of her economic monetary damages; and

• Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

• Awarding prejudgment interest; and

• Such other relief as this Court may find just and equitable.

## COUNT 3

### Violation of the Americans with Disabilities Act

### 42 U.S.C. §§12131, *et seq.*

### *J.S. v. Disney*

93.   Plaintiff J.S. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

94.   J.S. has autism.

95.   J.S. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

96.   J.S. is seven years of age and is generally in the care of his mother, D.S., who brings this action as J.S.'s next friend and natural guardian.

DOGALI LAW GROUP, P.A.

97.   J.S. and D.S are residents of Palm Beach County, Florida.

98.   For many years leading up to October of 2013, from the time J.S. was an infant, J.S. and D.S. and their family visited the Disney Parks at Walt Disney World many times.  During approximately the last four years of that time, J.S. carried the red card associated with the Guest Assistance Card system, and he was admirably accommodated.   During those visits, J.S. exhibited a nature and extent of joy that he rarely showed in any other setting.  D.S. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere.

99.   J.S.'s cognitive impairments manifest themselves in a certain way during his visits to the parks; J.S. is "repeat rider."  This is a variety of the trait of requiring consistency, order and routine.  Specifically, J.S. will ride a particular ride or experience a particular attraction over and over, for several hours at a time.  Disney personnel are very familiar with the repeat rider type of guest, in that they have discussed such guests with D.S. while D.S. and J.S. have visited the Parks.

100.  J.S. cannot tolerate long lines and wait times.  When he was only two, when J.S. had only just been diagnosed as autistic and before D.S. became aware of the availability of the Guest Assistance Card, J.S. experienced a meltdown event on the Winnie the Pooh ride.  After a short wait in the line, J.S. began hitting things and eventually fell to the ground in total meltdown.  Over time, as is the case with any mother of an autistic person, D.S. became very familiar with J.S.'s impulsivity and stimming activity.  One thing she knows to protect J.S. from is exactly the experience to which Disney insists upon subjecting him – idle wait times.  The family has occasionally tested J.S.'s ability to idly wait in a

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

queue.  After only a few minutes J.S.'s stimming increased, after which a meltdown would follow if left in that situation.

101.  After October 9, 2013, J.S. no longer received individualized attention when J.S. and D.S. visited the Parks.  Their first visit during the DAS card period occurred December 11-13, 2013.  The first evening of their arrival they did not need the DAS card as they only watched Magic Kingdom parades and visited one attraction that had no wait.

102.  Their first full day was at Epcot.  When they reported to Epcot, a Disney Guest Relations employee said they needed to take J.S.'s, photograph, which Disney had never required in the past.  After the photograph was taken, the Disney employee explained the DAS card.  D.S. immediately advised that the system will not work for autistic persons like J.S.  She explained that J.S. is a repeat rider, a concept which was familiar to the employee.  The employee then turned over the DAS card along with a stack of about a dozen fast passes – three for each of the four persons in their party.

103.  Upon leaving Guest Relations at Epcot, J.S. unsurprisingly trekked immediately to Test Track, where the wait time was substantial.  D.S. knew immediately that it was impossible for J.S. to _not_ ride the ride once they'd arrived; the suggestion that they should come back later was absurd.  Anyone with a working knowledge of persons with cognitive impairments, which Disney possesses, knows that an autistic child cannot comprehend postponing a present-tense pleasure in this fashion.  Doing so would make no more sense to J.S. than being given a plate of wonderful food and being told not to eat it now, but rather to go away and come back and eat it in an hour.

104.  Similarly, Disney's suggestions that autistic persons should "practice waiting in line," or should pass the time waiting for the ride by "doing

Page 40

DOGALI LAW GROUP, P.A.

other fun things," or "having a snack," or "browsing in the stores" is so incomprehensible as to be insulting.  J.S., like other autistic persons, is incapable of "browsing" or otherwise idly passing the time.

105.  Given no option other than the extended wait, they used the Fast Passes to ride Test Track several times until J.S. grew weary of it.  After traveling to another attraction where they did not need to use their Fast Passes, D.S. did not know which attraction J.S. might select next. She knew they could not visit another ride which might have a wait time, because if they reached the ride and J.S. was not permitted to ride it, an unfortunately traumatic event would unfold.  The family left the park after visiting only two Epcot attractions and went to Hollywood Studios.

106.  At Hollywood Studios, D.S. understood they were expected to report to Guest Relations so she could ask Disney for more passes to supplement the DAS card, and because the Fast Passes they had been given the day before indicated on their face that were valid only at Epcot.

107.  The family arrived at Hollywood Studios around mid-day to discover they had to wait in a 30-minute line to receive accommodations to avoid waiting in line.  J.S. waited a short time in the line with D.S. but not could sustain it.  When D.S. reached the front she was met by a Disney employee who was less cordial than the Epcot employee had been.  The employee again explained the DAS card.  D.S. advised her that the system could not work for an autistic child like J.S.  The employee gave D.S. two Fast Passes for each member of the family and said they might be able to get more once those were used, but the family would need to return to Guest Relations to retrieve them.  When D.S. tried to explain why this approach did not accommodate J.S., the employee abruptly told D.S. that there is simply nothing more Disney

will do for J.S. and his family.  When D.S. asked whether they could, at least, receive three Fast Passes, as had been given to them at Epcot, the Hollywood Studios employee, in a demonstration of Disney's unpredictable accommodation practices, said she didn't know why they handled it that way at Epcot, because that was not consistent with Disney policy.

108.   They left Guest Relations to find a 65-minute wait time at Toy Story. They used Fast Passes to ride Toy Story twice, then gave up on further rides.  They watched a show, had dinner, and went home.

109.   On the third day – December 13, 2013 – they visited Epcot again because Magic Kingdom was blacked out for them.  They rode Test Track again, then one ride twice which had no line (Spaceship Earth), another attraction which had no line (Captain EO), and left.

110.   J.S. and D.S. do not intend to visit the Parks as they would have if Disney had not abandoned its past policy of accommodating the special needs of persons with cognitive impairments.  Their interest in attending Disney Parks is substantially reduced.  D.S. knows they should avoid attending the Parks in the future due to the expectation that the experience will again be a supremely un-accommodating one, and due to the risk that the experience will be destructive for J.S.

WHEREFORE, Plaintiff J.S., through D.S. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of J.S.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience

DOGALI LAW GROUP, P.A.

1 Disney's goods, services, facilities, privileges, advantages, and
2 accommodations; and

3 • Establishing Court-approved remedial measures that Disney must
4 implement, to prevent Disney from further discriminating against
5 Plaintiff when they visit the Disney Parks; and

6 • Establishing Court-approved requirements for information
7 dissemination about Disney's remedial measures and modified
8 policies, to prevent Disney from further deterring Plaintiff from
9 visiting Disney Parks as a result of anticipated discrimination; and

10 • Establishing a monitoring program to ensure Disney's compliance
11 with the Court's Orders; and

12 • Awarding reasonable attorney's fees as may be determined by the
13 Court in favor of Plaintiff and against Disney; and

14 • Awarding reasonable litigation costs as may be determined by the
15 Court in favor of Plaintiff and against Disney; and

16 • Such other relief as this Court may find just and equitable.

## COUNT 4
### Breach of Contract
### *D.S. v. Disney*

111. Plaintiff D.S. incorporates and re-alleges the allegations of paragraphs 1
through 66, and 94 through 110 above.

112. D.S., through D.S.'s acquisition of Disney tickets for D.S. and her family,
entered into a contract through which Disney promised to provide a
reasonable and enjoyable amusement park experience, and one which
complies with applicable law.

DOGALI LAW GROUP, P.A.

113. Disney failed or refused to provide the promised experience, and is in breach of contract.

114. D.S. incurred monetary costs in purchasing tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks. Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff D.S. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with D.S.; and
- Entering judgment for Plaintiff D.S. in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 5

### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *S.J.K. v. Disney*

115. Plaintiff S.J.K. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

116. S.J.K. has Down syndrome and is autistic. To a limited extent, S.J.K. can verbally communicate to others. To a more limited extent, S.J.K. can receive and process select communications from others related mostly to routine and daily living. He is sensory input sensitive, cannot read or write, is visually impaired, is a continuing heart patient following open

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.,* case no. 14-2530

DOGALI LAW GROUP, P.A.

heart surgery, and suffers from hypotonia which causes him to become easily fatigued.

117. S.J.K. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

118. S.J.K. is 18 years of age and is generally in the care of his mother, S.L.K., who brings this action as S.J.K.'s next friend, parent and court-appointed Co-Guardian.

119. S.J.K. and S.L.K. are residents of Oakland County, Michigan.

120. Many years ago, before S.J.K. was born, S.L.K. visited Walt Disney World with her husband, S.J.K.'s father.  A few years later, when S.J.K. was two, they visited again and took S.J.K. along.  Those two visits, many years ago, were wonderful, magical Disney experiences.  Disney treated the family, including S.J.K., terrifically.

121. Over the years S.L.K and her husband remained enamored with Disney in every way, and they always hoped to return to the Park.  It was simply beyond their means to do so.  For many years, S.L.K. and her family planned and saved for their return to Walt Disney World.  None of the family visited Walt Disney World again until the family was able to take their long-awaited vacation there in October of 2013, after S.J.K. was 18.  If only they had waited 15.5 years instead of 16, it would have been the vacation they had always dreamed about.  Instead, it ended up a horrible experience.

122. S.J.K. is incapable of tolerating idle times of inactivity such as standing in a line.  Nor could he ever compute the concept of going all the way to a ride and not riding it, with an alternative plan to return later.  Like other autistic persons, S.J.K. does not comprehend alternatives to apparently presently-available experiences.

DOGALI LAW GROUP, P.A.

123.   When placed in such situations, S.J.K. experiences meltdowns like most autistic children, though they appear different.  Rather than the more common manifestation of going to the ground and flailing wildly and moving uncontrollably, S.J.K. tends to internalize.   As stimulation increases, S.J.K. becomes more withdrawn and mute.   Ultimately, if over-stimulated, he will fall to the ground and lay still and silent. Unfortunately, he is now too large for his mother, especially in light of her own disability, to easily lift him off the ground and remove him from the situation.

124.   S.L.K. is not a routine, avid web-surfer to the extent of many parents in the autistic community, so she had learned few details about the widely-despised DAS system.   She knew only that Disney had implemented some kind of new system for accommodating disabled persons.  She did not care to inquire very much into the details of that system, because she held the Walt Disney Company in such high regard and esteem that she was completely confident that whatever system Disney might have, it would be the finest possible, and it would be implemented with care and kindness.

125.   During the intervening 16 years, the family periodically visited the Disney website to view the Parks and attractions.  S.J.K. had developed a few favorite characters and attractions, characters and attractions that always brought joy when he viewed them online, including Mickey Mouse himself, Cinderella's Castle, It's a Small World, Grand Prix Raceway, and a few others.

126.   The family dedicated an extended vacation to the trip to Walt Disney World and set off on the drive from Michigan.  They had purchased 6-day Park-Hopper packages which also included Disney resort accommodations as well as water parks and meals.  They planned to

visit all four Walt Disney World Parks during their stay, along with other Disney facilities.

127. S.J.K. and S.L.K. were accompanied on their trip by the gentleman who is S.J.K's father and S.L.K.'s husband, and by S.L.K.'s mother. S.L.K. and S.L.K.'s mother are also disabled persons; they each face mobility challenges. S.L.K. can stand and/or walk only limited distances due to a number of cardiovascular issues and surgeries; S.L.K.'s mother had recently undergone knee replacement surgery and would need a wheelchair to navigate the Parks.

128. The family arrived at the Walt Disney World Resort in the middle of the day and proceeded to their hotel, Disney's Caribbean Beach Resort, to check in. Upon check-in, the Disney employee at the desk handed them their "Magic Bands," but told them very little about the Magic Bands. They were told only that the Magic Bands would be their hotel room key, purchasing card, and park admission ticket. They never knew, and in fact did not know until four months after the family's visit to Walt Disney World, that the Magic Bands could also be used to arrange a limited number of admission times to certain rides and attractions.

129. The next morning, prior to their planned visit to Magic Kingdom, S.J.K. was amazingly excited about the day ahead. Upon arriving at Magic Kingdom, the family entered the gates and, looking down Main Street at Cinderella's Castle, felt the same excitement and wonder that millions of other visitors experience every year.

130. To S.L.K., the sight of S.J.K. at that exhilarating moment, staring wonderfully down Main Street with a look of pure joy, was the entire reason they had planned the trip. She would not see another look of joy on S.J.K.'s face for the rest of that day. In fact, for the entire six days that they would spend in the park, she would see that look only once more,

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

and it would not be in connection with a ride or attraction; it would be when Mickey Mouse visited with S.J.K.

131. The family then proceeded to Guest Relations, as S.L.K. understood they were expected to do.  Upon arrival at City Hall, S.L.K. was immediately shocked to see a huge crowd waiting in a very long line which extended out of the building and into Main Street.  S.L.K. waited in the line for a very long time before the line even advanced into the City Hall building. After another 45 minutes, S.L.K. reached the front of the line.

132. At the front of the Guest Relations line, Disney's shattering of the spirit of S.J.K. and S.L.K. and their family, which would continue for six days, took form in the new species of Disney employee they encountered at the Parks.  From that moment and throughout their stay, the employees consistently displayed an attitude toward S.L.K. which could only leave her convinced that they had adopted a "we don't want to hear about your problems" attitude.   She was specifically told by multiple employees that "we can't ask" you questions about how we might help you – even when S.L.K. was obviously voluntarily trying to initiate an open and candid discussion about the family's situation and special needs.  In the end, she concluded that the employees were deliberately building a front of ignorance.  This type of unfortunate interaction with Disney employees started immediately, at Guest Relations.

133. Upon reaching the front of the line, S.L.K. was greeted by a Disney employee.  S.L.K. did not know what she was supposed to say or do, did not know what to request.  She said she was there with her family and that they have some disabilities.  The Disney employee asked: "What are these disabilities?"  S.L.K. responded that her son is disabled and that she and her mother have mobility problems.  The employee looked S.L.K. incredulously and said: "Well, you and your mother can obviously

DOGALI LAW GROUP, P.A.

walk, so the most Disney can do for you is offer you a wheelchair rental" to make S.L.K. and her mother more comfortable while they wait in lines.  The employee added that "wheelchairs can be rented for $12.00 per day and electric scooters for $40.00 per day."  Until that moment, it had not occurred to S.L.K. that the only accommodation Disney would offer them was a wheelchair, and that Disney would charge money for the accommodation.  She shuddered at the thought that in order to wait in lines they would have to rent _three_ wheelchairs, so that S.L.K. and her mother could withstand waiting in lines; perhaps another for S.J.K.  They had not included even one wheelchair rental in their vacation budget; the possibility of more than one was out of the question.

134.  S.L.K. then advised the employee that her son has Down Syndrome. S.J.K. could never have waited in the City Hall line so he was not present.   Not seeing S.J.K. nearby, the employee stared coldly and disbelievingly at S.L.K. and repeated the wheelchair script.   At that point S.J.K. came running in, arrived at S.L.K.'s side, and promptly fell to the City Hall floor.  Seeing that S.J.K. really does have Down Syndrome, the employee said "well, maybe your son does qualify for some kind of accommodation" and disappeared into the back offices of City Hall. After an extended time of perhaps 15 minutes she emerged with a green card and eight Fast Passes (two per family member).

135.  The Disney employee explained how the green DAS card would work. S.L.K. told her this procedure would not work for S.J.K. and tried to explain why, by explaining certain traits that are inherent in S.J.K. and persons with similar cognitive impairments.  The Disney employee did not want to hear it, and said that "the DAS card is all Disney will do for your son;" that the two Fast Passes per family member were an added

DOGALI LAW GROUP, P.A.

benefit for the whole family.  S.L.K. then asked, if all Disney could provide was the DAS card for S.J.K. and wheelchair rentals for others, who would push all these wheelchairs when they have only four persons in their party?  The Disney employee, still exhibiting no care or concern, robotically repeated her prior lines.   Just as the Disney employee at the Caribbean Beach Resort the previous day did not explain any of the Fast Pass attributes of the Magic Bands to the family at check-in, the Guest Relations employee did not explain that Disney also provided in-park Fast Pass appointments at certain rides.

136.   Resigned to the fate that Disney would provide them no effective accommodation, S.L.K. resolved to take what was being offered, and she helped S.J.K. through the DAS card process.  S.L.K. was immediately put back by Disney's insistence that S.J.K. be photographed as a condition of receiving any accommodation whatsoever.   No other visitors to the Parks must be photographed.  And then she was disturbed to see that Disney, inexplicably, required that S.J.K.'s photograph appear below a legend which, in the most prominent and largest font on the DAS card, included the word "Disability."  Having completed these insulting steps in the process, the family left City Hall, two hours after S.L.K. first got in line.

137.   The family proceeded first to rent a wheelchair for shared family use; they could not afford more than one, and even if they could have, multiple pushers of the wheelchairs would not be available.

138.   The family then tried to approach Cinderella's Castle so that S.J.K. could perhaps go inside it or touch it.  Due to the crowds and their own situation they could get nowhere near it.

139.   Based upon S.J.K.'s love of cars and his visits to the Disney website, the family went to the Grand Prix Raceway, which they had talked about for

Page 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

a long time leading up to their vacation.  Upon arrival, they saw a line that was staggeringly long, and immediately knew S.J.K. could not withstand it.  And the notion of not riding it after taking S.J.K. to it, so that they could come back at some future time, was preposterous.  So the family used four of the eight Fast Passes to enjoy the ride.  S.J.K. wanted to ride the ride again, so he and his father did so, using two of the remaining Fast Passes and preserving the last two.

140.   The family then went to the Haunted Mansion, where they were confronted by a similarly impossible line.  They told a Disney employee that they only had two Fast Passes left for the four of them.   The employee allowed the four of them onto the ride while collecting their last two Fast Passes.

141.   After the Haunted Mansion, the lack of further accommodation for S.J.K.'s need left the family unable to experience any further rides or attractions.  They wandered around, watched a parade, had dinner, and left, having visited only two attractions the entire day.  They missed the opportunity to visit one attraction about which S.J.K. had dreamed: It's a Small World.  They would not have been able to manage the line, and had no Fast Passes left.

142.   That evening, S.L.K. and her husband lamented the awful day and wondered between them whether it was something about their family that had caused Disney to act so unwelcomingly and uncaringly.  Surely other persons and families with disabilities were being meaningfully accommodated?

143.   On another day, the family visited Hollywood Studios.  They went first to Guest Relations, where they were met with a one-hour wait in line.  When S.L.K. finally arrived at the front, she was frustrated to find that only one of several stations had been manned to serve the persons in

Page 51

1  the line.  S.L.K. told the single Disney employee that they had a DAS
2  card, which she showed to the employee, and she asked what further
3  accommodation was available.  The employee responded by handing
4  her one Fast Pass per family member (a total of four).  S.L.K. said "I
5  don't understand the system. How do I get more?  Why only one? Why
6  not three? Or six? Or some other number?" To which the employee
7  replied: "The most I can do for you is one Fast Pass per family member."

8  144.  The family left Guest Relations and went on two rides in Hollywood
9       Studios: The Great Movie Ride and Toy Story.  Out of Fast Passes, they
10      were unable to experience anything else, because they never saw a line
11      which presented less than a one-hour wait.

12  145.  The family visited Animal Kingdom on day three and Epcot on day six,
13      each of which was just as unfortunate and frustrating as day one and
14      day two had been.  Each day began with a Guest Relations visit, where
15      they were given two Fast Passes per family member.

16  146.  At Animal Kingdom and Epcot, S.L.K. told the Guest Relations personnel
17      their DAS card system did not accommodate S.J.K.   But, after her
18      experiences the first two days, S.L.K. gave up on further efforts to
19      explain to the Disney employees why their one-size-fits-all DAS card
20      does not accommodate S.J.K. The Animal Kingdom and Epcot Guest
21      Relations employees were just as unfeeling and relentlessly uncaring as
22      the other employees had been the first two days.

23  147.  At Animal Kingdom and Epcot, pushed away by Disney's refusal to find
24      a way to accommodate S.J.K. in the face of Disney's bizarrely long lines
25      and wait times, the family used their Fast Passes for entry onto two
26      popular attractions in each park, wandered around some, and left.

27  148.   S.J.K. possesses some self-awareness.  He may not understand that he is
28      developmentally disabled in comparison to others, but he understands

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

that his special needs, or his own involuntary behaviors, can cause bad times for others.  When he displays behavior that clearly creates a negative situation for his parents, S.J.K. will often exhibit a face of sorrow and will say "I'm sorry" to S.L.K.

149. S.J.K. suffered astonishing mental anguish, emotional trauma, humiliation and embarrassment as a result of Disney's discrimination against him and Disney's treatment of him.  S.L.K. also suffered tragic mental pain and suffering, humiliation and embarrassment as a result of Disney's discrimination against S.J.K.

150. Had their Disney experience been a fine one, akin to the experience no doubt provided by Disney to non-disabled persons, S.L.K. would already be saving for a return family vacation.  Unfortunately, her family's experience at the Parks, and her learning since their vacation of Disney's widespread disregard for the needs of persons with cognitive impairments, leads her to conclude that until Disney decides to return to accommodating persons like S.J.K., they will not even begin to save or plan for such a trip.  The first six days of misery were enough; S.L.K. has no interest in being treated this way again, and is especially uninterested in her son being treated this way again.

WHEREFORE, Plaintiff S.J.K., through S.L.K. as his next friend, parent and court-appointed Co-Guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of S.J.K.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

## **COUNT 6**
### **Negligent Infliction of Emotional Distress**
### ***S.J.K. v. Disney***

151. Plaintiff S.J.K. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 116 through 150 above.

152. During one or more visits to the Parks, S.J.K. suffered an actual meltdown.

153. The symptoms and conditions associated with S.J.K.'s meltdown constitute a physical injury under Florida law.

154. S.J.K.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of S.J.K. during his patronage of Disney's facilities. At all material times, Disney

knew S.J.K. to be vulnerable to emotional injury if treated in such a manner by anyone.

155. S.J.K.'s meltdown and the treatment which proximately caused S.J.K. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.J.K., by and through S.L.K. as S.J.K.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

• Finding that Disney negligently inflicted emotional distress upon S.J.K.; and

• Finding such infliction to have caused damages to S.J.K.; and

• Entering judgment for Plaintiff S.J.K. in the amount of such damages; and

• Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

• Awarding prejudgment interest; and

• Such other relief as this Court may find just and equitable.

## COUNT 7
### Intentional Infliction of Emotional Distress
### *S.J.K. v. Disney*

156. Plaintiff S.J.K. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 116 through 150 above.

157. During one or more visits to the Parks, S.J.K. suffered an actual meltdown.

DOGALI LAW GROUP, P.A.

158. The symptoms and conditions associated with S.J.K.'s meltdown constitute a physical injury under Florida law.

159. S.J.K.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of S.J.K. during his patronage of Disney's facilities.  At all material times, Disney knew S.J.K. to be vulnerable to emotional injury if treated in such a manner by anyone.

160. S.J.K.'s meltdown and the treatment which proximately caused S.J.K. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.J.K., by and through S.L.K. as S.J.K.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon S.J.K.; and
- Finding such infliction to have caused damages to S.J.K.; and
- Entering judgment for Plaintiff S.J.K. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOGALI LAW GROUP, P.A.

## **COUNT 8**

### **Breach of Contract**

### *S.L.K. v. Disney*

161.   Plaintiff S.L.K. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 116 through 150 above.

162.   S.L.K., through S.L.K.'s acquisition of Disney tickets for S.L.K., S.J.K., and their family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

163.   Disney failed or refused to provide the promised experience, and is in breach of contract.

164.   S.L.K. incurred monetary costs in purchasing tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff S.L.K. prays that this Court adjudicate this dispute and enter an Order:

•   Finding that Disney breached its contract with S.L.K.; and

•   Entering judgment for Plaintiff S.L.K. in the amount of her economic monetary damages; and

•   Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

•   Awarding prejudgment interest; and

•   Such other relief as this Court may find just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOGALI LAW GROUP, P.A.

## COUNT 9

### Negligent Infliction of Emotional Distress
### *S.L.K. v. Disney*

165. Plaintiff S.L.K. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 116 through 150 above.

166. During one or more visits to the Parks, S.L.K.'s beloved son S.J.K. suffered an actual meltdown while in S.L.K.'s presence.

167. The symptoms and conditions associated with S.J.K.'s meltdown constitute a physical injury to S.J.K. under Florida law.

168. S.J.K.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of S.J.K. during his patronage of Disney's facilities.  At all material times, Disney knew S.J.K. to be vulnerable to emotional injury if treated in such a manner by anyone.

169. S.L.K. directly observed the stressors leading up to the meltdown, S.J.K.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, S.L.K. could do nothing reasonable to prevent the meltdown.

170. S.L.K.'s observation of S.J.K.'s meltdown and of the outrageous conduct and treatment which proximately caused S.J.K. to experience the meltdown caused S.L.K. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

   **WHEREFORE**, Plaintiff S.L.K. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon S.L.K.; and

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

- Finding such infliction to have caused damages to S.L.K.; and
- Entering judgment for Plaintiff S.L.K. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 10

### Intentional Infliction of Emotional Distress
### *S.L.K. v. Disney*

171. Plaintiff S.L.K. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 116 through 150 above.

172. During one or more visits to the Parks, S.L.K.'s beloved son S.J.K. suffered an actual meltdown.

173. The symptoms and conditions associated with S.J.K.'s meltdown constitute a physical injury under Florida law.

174. S.J.K.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of S.J.K. during his patronage of Disney's facilities.  At all material times, Disney knew S.J.K. to be vulnerable to emotional injury if treated in such a manner by anyone.

175. S.L.K. directly observed the stressors leading up to the meltdown, S.J.K.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, S.L.K. could do nothing reasonable to prevent the meltdown.

DOGALI LAW GROUP, P.A.

176. S.L.K.'s observation of S.J.K.'s meltdown and of the outrageous conduct and treatment which proximately caused S.J.K. to experience the meltdown caused S.L.K. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.L.K. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon S.L.K.; and
- Finding such infliction to have caused damages to S.L.K.; and
- Entering judgment for Plaintiff S.L.K. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 11
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *A.B. v. Disney*

177. Plaintiff A.B. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

178. A.B. has autism.

179. A.B. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

DOGALI LAW GROUP, P.A.

180. A.B. is six years old and is generally in the care of his mother, M.B., who brings this action as A.B.'s next friend, parent and natural guardian.

181. A.B. and M.B. are residents of Palm Beach County, Florida.

182. M.B. grew up a Disney fan, first traveling to a Disney park in 1971. She grew up visiting the Parks two to three times a year. Disney was "in her blood;" her parents loved going to Walt Disney World, and took advantage of any opportunity to take M.B. to Magic Kingdom.

183. M.B. and her husband first took A.B. to the Walt Disney World Parks to share her history of magical experiences when A.B. was three months old. At the time, Disney used the Guest Access Card system and made an effort to accommodate A.B. on account of his cognitive disability. From the first time M.B. and A.B. visited Magic Kingdom, M.B. felt instant relief. Walt Disney World Parks provided a place where M.B. and her husband could take A.B. and not be judged or feel adjudicated. Indeed, Walt Disney World Parks were one of the few places M.B. and her husband could take A.B. and A.B. would legitimately have a good time.

184. M.B. and her husband took A.B. to the Parks three to four times per year before October 2013. In January, 2014, M.B. and A.B. did not renew their annual passes.

185. For M.B. and A.B., a typical visit to the Walt Disney World Parks started with their arrival at Guest Relations at Magic Kingdom to obtain the Guest Assistance Card from Disney employees who were kind and friendly, always greeting M.B. and A.B. with smiles. Next, they headed directly to It's a Small World, and a few other attractions before attending a character lunch. M.B. and A.B. routinely left Magic Kingdom feeling satisfied and happy. Typically,

DOGALI LAW GROUP, P.A.

they rested before going to Epcot at night for an evening of more rides before a character dinner.  M.B and A.B. repeated this the next day.  A.B. was able to stay in a park for two to three hours, during which he showed his happiness the entire time.

186. The experience was drastically different beginning in October of 2013, when Disney rolled out its Disability Access Service system.  Suddenly, Disney no longer provided the individualized attention that, once upon a time, made A.B.'s experience a magical one.

187. A.B. is incapable of tolerating idle times of inactivity such as standing in line.  A.B. also exhibits "repeat rider" traits as well as a commitment to routine and consistency.  A.B. must always begin his Disney experience with It's a Small World, which he repeats numerous times before moving on to his next favorite ride, The Little Mermaid.  In addition to frequently riding the same ride over and over again, A.B. cannot be surrounded by large groups of people or crowds, so the concept of waiting in a crowded queue is appalling to M.B. as it could lead to a meltdown for A.B.  Additionally, being denied the ability to repeat a particular ride is disastrous to A.B.'s magical experience.  A.B. likes to ride and repeat a few specific rides, attend one character lunch and then leave.

188. A.B. lacks the capacity to comprehend the concept of going all the way to a ride and not riding it.  Being offered an appointment in the future to offset the deprivation in the present is meaningless; A.B. cannot follow such logic and would melt down at the present deprivation without ever understanding the so-called future appointment.

189. When forced to be around crowds of people, A.B. becomes over-stimulated and will begin to stim.  This stimming includes self-

inflicted hitting, rolling around on the floor, hitting his ears, and banging his head against the floor.  Were A.B. to visit It's a Small World and be told he cannot ride it but can come back in forty-five minutes to do so, A.B. would undoubtedly experience a meltdown event, which would require M.B. to pick him up and carry him until they were able to leave the park.  Such events are so ugly and traumatic for A.B. that M.B. of course does whatever she can to avoid them, for his benefit.

190.  Prior to October of 2013, A.B. never had a meltdown at the Walt Disney World Parks, because Disney was very accommodating and welcoming to A.B., allowing him quick and immediate access to the rides, often repeatedly.

191.  In advance of October 2013, M.B. and her husband planned a trip to Walt Disney World Parks with A.B.  The trip was to culminate with Mickey's Not-So-Scary Halloween Party.  As the planning developed, M.B. learned that Disney had implemented some kind of new system for attempting to accommodate disabled persons.  She learned only a few details about the program, mostly from the My DAS Experience Facebook page.

192.  For more information, M.B. contacted Disney by telephone, before the family's October 2013, trip for more details about the widely-despised Disability Access Service system.   In this telephone discussion, Disney assured M.B. everything would be fine – Disney even told M.B. the new system would be better than the Guest Access Card.   Because M.B. had been a life-long Disney fan, she was completely confident that whatever new system Disney might have, it would be the finest possible, fully accommodating A.B.'s needs with the care and kindness Disney had showed him in the past.

193. The weekend before Halloween in October 2013, M.B., her husband, and A.B. arrived at Walt Disney World.  As they had done in the past, they reported first to Guest Relations.   Unlike on their previous visits, they were confronted with a one and a half hour wait.   The wait was chaotic, with people uniformly complaining about the new Disability Access Service card while waiting to for their pictures to be taken.  M.B. shared the line with a plethora of complaining guests in wheelchairs, in addition to the chaos created by the DAS system. After one and a half hours of waiting, M.B. finally reached the front of the line, in a position to speak with a Disney employee.   The Disney employee, who insisted upon taking a picture of A.B., eventually succumbed to merely a side-shot because A.B. could not sit still long enough to allow his picture to be taken.  The Disney employee did not want to discuss specifics about A.B.'s disability and did not try to make specific accommodations.  Instead, he offered the DAS card and told M.B. to "go ahead and try it!  It will be great."  M.B. tried to explain A.B.'s condition and need, even offering documentation from A.B.'s neurologist substantiating his inability to tolerate wait times.   The Disney employee immediately responded that she was "not allowed to look at that!"   No fast passes were offered or given, merely a card with A.B.'s picture below the prominent label: "DISABILITY."

194. M.B. and A.B. walked to It's a Small World, where their magical experience had always begun.   This time, however, a Disney employee barked to M.B. that they would have to come back later, so they must go and "do something else!"  His final suggestion was to "go eat lunch!"  The wait time was one hour and fifteen minutes.

195.   Astonished and at a loss, with no options, M.B. tried the approach mandated by Disney; she took A.B. to eat lunch while he painstakingly waited to ride the much beloved It's a Small World. One hour and fifteen minutes after first arriving, they rode the ride, after which M.B. went back to the queue to speak to the Disney employee about riding the ride again, as A.B. had always done in the past.  She was horrified to discover they would have to endure the same process as before: put their name on the list; find something to do; and come back.  This would only work for A.B. one more time.

196.   After the second time, A.B. was done.  Upon being told he had to endure a third wait for the ride – the same ride on which Disney had accommodated him on dozens of prior trips and which had ridden perhaps hundreds of times in the past – A.B. entered into a full-fledged meltdown.  A.B.'s stimming spun out of control, and he commenced flapping his arms, striking himself, and falling to the ground, whereupon he eventually shut down, leaving M.B. to do everything she could to try to transition A.B. back to a coherent state – perhaps even to find, once again, the Disney Magic.

197.   Sadly, it would be the first of three meltdowns for A.B., after which M.B. had no choice but to cancel their Not-So-Scary-Halloween Party tickets, and leave Walt Disney World.  M.B. has been through a lot as a parent, but watching Disney employees treat A.B. as a second-class guest, like he was offending them by being in the Parks, was too much to stomach.  It was a long ride home for A.B, M.B, and her husband.  This was the first time A.B. left Walt Disney World Parks unhappy.

198.   Despite their un-magical, nightmarish experience, M.B. planned a return visit in December of 2013.  She just could not believe that

Page 65

Disney had become so bad, so un-magical.  She had to give Disney one more chance, the proverbial benefit of the doubt.

199.  The trip to Walt Disney World in December 2013 was even worse than their trip in October.  The Disney employees displayed a robotic lack of understanding and care toward A.B., mechanically discriminating against him and refusing to offer any meaningful accommodation for his special need.   A.B. experienced no enchantment, only condescension, judgment, and longer wait times.  Again, this experience built up in A.B. toward an incident of epic and terrifying proportions, the likes of which M.B. and her husband had never experienced with A.B.

200.  December of 2013 was the last time M.B. and her husband took A.B. to Walt Disney World.   For so long as Disney persists in its abandonment of Disney's prior policy of accommodating the special needs of persons with cognitive impairments, A.B. and M.B. will not visit the Parks again.  M.B. knows that attending Walt Disney World in the future will again be a supremely un-accommodating experience, one which would be destructive for A.B.  She cannot tolerate another un-enchanting experience for A.B.  She cares too much for him, and Disney no longer cares at all.

**WHEREFORE**, Plaintiff A.B., through M.B. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of A.B.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

## COUNT 12
### Negligent Infliction of Emotional Distress
### *A.B. v. Disney*

201. Plaintiff A.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 178 through 200 above.

202. During one or more visits to the Parks, A.B. suffered an actual meltdown.

203. The symptoms and conditions associated with A.B.'s meltdown constitute a physical injury under Florida law.

1    204.  A.B.'s meltdown in the Parks was proximately caused by Disney's
2          negligent, unlawful, reckless and arbitrary treatment of A.B. during
3          his patronage of Disney's facilities.  At all material times, Disney
4          knew A.B. to be vulnerable to emotional injury if treated in such a
5          manner by anyone.
6    205.  A.B.'s meltdown and the treatment which proximately caused A.B. to
7          experience the meltdown caused him grave and extreme mental
8          anguish and emotional trauma, for which Disney should be held
9          accountable.
10         **WHEREFORE**, Plaintiff A.B., by and through M.B. as A.B.'s next
11   friend, parent and natural guardian, prays that this Court adjudicate this
12   dispute and enter an Order:
13         •    Finding that Disney negligently inflicted emotional distress upon
14              A.B.; and
15         •    Finding such infliction to have caused damages to A.B.; and
16         •    Entering judgment for Plaintiff A.B. in the amount of such
17              damages; and
18         •    Awarding reasonable litigation costs as may be determined by the
19              Court in favor of Plaintiff and against Disney; and
20         •    Awarding prejudgment interest; and
21         •    Such other relief as this Court may find just and equitable.

22
23                              **COUNT 13**
24              **Intentional Infliction of Emotional Distress**
25                          ***A.B. v. Disney***
26
27   206.  Plaintiff A.B. incorporates and re-alleges the allegations of
28         paragraphs 1 through 66, and 178 through 200 above.

DOGALI LAW GROUP, P.A.

207. During one or more visits to the Parks, A.B. suffered an actual meltdown.

208. The symptoms and conditions associated with A.B.'s meltdown constitute a physical injury under Florida law.

209. A.B.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of A.B. during his patronage of Disney's facilities.  At all material times, Disney knew A.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

210. A.B.'s meltdown and the treatment which proximately caused A.B. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff A.B., by and through M.B. as A.B.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon A.B.; and
- Finding such infliction to have caused damages to A.B.; and
- Entering judgment for Plaintiff A.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 14

### Breach of Contract

### *M.B. v. Disney*

211. Plaintiff M.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 178 through 200 above.

212. M.B., through M.B.'s acquisition of Disney tickets for M.B. and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

213. Disney failed or refused to provide the promised experience, and is in breach of contract.

214. M.B. incurred monetary costs in purchasing tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks. Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff M.B. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with M.B.; and
- Entering judgment for Plaintiff M.B. in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

### COUNT 15

### Negligent Infliction of Emotional Distress

### *M.B. v. Disney*

215. Plaintiff M.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 178 through 200 above.

216. During one or more visits to the Parks, M.B.'s beloved son A.B. suffered an actual meltdown while in M.B.'s presence.

217. The symptoms and conditions associated with A.B.'s meltdown constitute a physical injury to A.B. under Florida law.

218. A.B.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of A.B. during his patronage of Disney's facilities.   At all material times, Disney knew A.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

219. M.B. directly observed the stressors leading up to the meltdown, A.B.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, M.B. could do nothing reasonable to prevent the meltdown.

220. M.B.'s observation of A.B.'s meltdown and of the outrageous conduct and treatment which proximately caused A.B. to experience the meltdown caused M.B. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff M.B. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon M.B.; and

- Finding such infliction to have caused damages to M.B.; and
- Entering judgment for Plaintiff M.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 16
### Intentional Infliction of Emotional Distress
#### *M.B. v. Disney*

221. Plaintiff M.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 178 through 200 above.

222. During one or more visits to the Parks, M.B.'s beloved son A.B. suffered an actual meltdown.

223. The symptoms and conditions associated with A.B.'s meltdown constitute a physical injury under Florida law.

224. A.B.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of A.B. during his patronage of Disney's facilities.  At all material times, Disney knew A.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

225. M.B. directly observed the stressors leading up to the meltdown, A.B.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, M.B. could do nothing reasonable to prevent the meltdown.

Page 72

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

226.   M.B.'s observation of A.B.'s meltdown and of the outrageous conduct and treatment which proximately caused A.B. to experience the meltdown caused M.B. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff M.B. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon M.B.; and
- Finding such infliction to have caused damages to M.B.; and
- Entering judgment for Plaintiff M.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 17
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *D.H. v. Disney*

227.   Plaintiff D.H. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

228.   D.H. has autism.

229.   D.H. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

230. D.H. is 19 years of age and is generally in the care of his mother, J.H., who brings this action as D.H.'s next friend, parent, and court-appointed guardian.

231. D.H. and J.H. are residents of Hartford County, Connecticut.

232. J.H. first visited Magic Kingdom when she was six-months pregnant with D.H.  From the time D.H. was born, leading up to October of 2013, D.H. and J.H. visited Walt Disney World dozens of times. Before Disney's Disability Access Service was released in October of 2013, D.H. carried the red card associated with the Guest Assistance Card service, and he was admirably accommodated.  During those visits, D.H. exhibited a nature and extent of joy that he rarely showed in any other setting.   J.H. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere.  During those visits, J.H. was enamored with the way Disney employees interacted with D.H., consistently making him feel exceptional and accepted.

233. For D.H. and J.H., a typical visit to the Parks before October 2013 was a terrifically pleasurable experience.  Typically, upon arriving at Guest Relations at Magic Kingdom, J.H. obtained a Guest Assistance Card for D.H. for their entire vacation.  After the brief stop at Guest Relations, J.H. and D.H. almost always started with the "Snow White" attraction and then rotated through others of D.H.'s favorite rides. With the Guest Assistance Card, wait times were never extensive and D.H. never had an unpleasant experience.  D.H. and J.H. usually spent the entire day in the Parks, from opening time to closing time. Before October 2013, this would be an annual, once-a-year occasion for D.H. and J.H. to experience as mother and son.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

234.  This tradition ended in October of 2013, when J.H. learned about the new Disability Access Service card.  Except for bloggers and posters who appear to be sponsored by or illicitly allegiant to Disney, visitors to the Parks who have used the DAS card uniformly find the system to be atrocious.  As a result, J.H. and D.H. are reasonably deterred from returning to the Parks.  J.H. knows Disney's DAS will increase D.H.'s stimming behaviors to uncontrollable levels.  D.H. and J.H. have not visited Walt Disney World as they did in the past, a situation which continues to this day.

235.  D.H.'s stimming patterns include verbal echolalia.  D.H. tends to perseverate on words or phrases; for example, he can say "No more noises!" repeatedly until the request is satisfied.  Regarding his Disney experience, D.H. will bring to J.H. videos of the Disney rides he wants to ride during his next trip, and he will tend to watch those videos again and again, repeating his need to ride that particular ride, again and again, until the day finally arrives when he finally is able to ride that ride.  If D.H.'s need to repeat an attraction is not satisfied, his verbal stimming increases in frequency and intensity until he is over-stimulated, which will cause him to begin biting his hand and pacing back-and-fourth.  He will repeat the need to repeat until eventually, a meltdown occurs.

236.  D.H. has no concept of time or tense, past or present, present or future.  He is incapable of understanding the concepts of waiting or delayed gratification.  D.H.'s cognitive impairments manifest themselves in a certain way during his visits to the Parks; D.H. is incapable of deviating from riding specific rides such as Peter Pan or It's a Small World.  And he is incapable of deviating from one sequence in which to experience the attractions:  he must start by

Page 75

DOGALI LAW GROUP, P.A.

visiting Winnie the Pooh, followed in order by Mickey's PhilharMagic, Peter Pan, and It's a Small World.  Additionally, D.H.'s Disney Experience is character-driven – a trip to the Parks would not be complete without seeing Snow White.  Disrupting the need to repeat, or the need to travel the Parks in a particular order, or the need to see a particular character, are all stressors for D.H.

237. Like most parents of autistic children, J.H. knows her child's stimming, tics, and tendencies.  She knows the stimuli and stressors that are likely to overwhelm him.  And she does not permit these stimuli to overwhelm him – no parent will permit a child to experience a meltdown if such can be avoided.

238. Upon learning of Disney's Disability Access Service, J.H. communicated with Disney in a cooperative effort to obtain reasonable accommodation for D.H.  The Disney employee offered her "readmit" passes as what he emphasized was a "one time courtesy," and admonished her not to expect such passes in the future as they were only "a one-time offer."  But as J.H. knows, and *as Disney knows*, autism is not a one-time disability.  It is a life-long, cognitive experience with far reaching consequences.  Disney's insistence on offering "one-time" solutions to lifetime problems demonstrates, on its face, that Disney is not operating in good faith toward persons with cognitive impairments.  The Disney employee who was determined to impart Disney's wisdom upon the family also advised J.H. to go online to reference Disney's guide for cognitively disabled guests, which includes such bizarre advice as "practice waiting in line."

239. To J.H., Disney was determined to display ignorance about how autism works, notwithstanding Disney's highly sophisticated knowledge of the

DOGALI LAW GROUP, P.A.

needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate D.H.'s special needs. Disney's advice was so contrary to Disney's body of knowledge and to Disney's historic performance that Disney cannot have accidentally proposed such absurdities as "practice waiting in line."

240. D.H. and J.H. have not visited the Parks since October of 2013. J.H. and D.H. will not visit the Parks as they have before, because J.H. knows the experience will be un-accommodating and destructive for D.H. In addition, J.H. knows that placing D.H.'s picture on a card and prominently labeling him as disabled will embarrass D.H. and make him feel stigmatized.

241. Despite this deep parental fear, J.H. is conflicted as a parent because D.H. loves Disney; he has loved Disney since the first time he laid eyes on Mickey Mouse and Snow White. J.H. feels compelled to return to the Parks with D.H. because D.H. developed a keen fascination with the magical Disney experience during the time Disney *actually* accommodated J.H. and D.H., with the prior Guest Assistance Card.

242. Disney's prior policy toward persons with cognitive impairments was so caring toward D.H., and D.H.'s love of the Disney experience was so exceptional, that J.H. was induced to purchase a Disney Vacation Club property about four years ago. She paid a purchase price of $14,700.00 for the property. In addition to paying the purchase price over time, she continues to pay $70.00 per month in Disney Vacation Club fees.

**WHEREFORE**, Plaintiff D.H., by and through J.H. as his next friend, parent and court-appointed guardian, prays that this Court adjudicate this dispute and enter an Order:

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of D.H.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.


[REMAINDER OF PAGE INTENTIONALLY BLANK]

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

## **COUNT 18**

### **Violation of the Americans with Disabilities Act**

### **42 U.S.C. §§12131, *et seq.***

### ***J.M. v. Disney***

243.  Plaintiff J.M. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

244.  J.M. is diagnosed with verbal apraxia, Oppositional Defiant Disorder (ODD) and severe Attention Deficit Hyperactivity Disorder (ADHD).

245.  J.M. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

246.  J.M. is seven years old and is generally in the care of her mother, E.M., who brings this action as J.M.'s next friend, parent and natural guardian.

247.  J.M. and E.M. are residents of Lorain County, Ohio.

248.  For many years leading up to October of 2013, from the time J.M. was five years old, J.M., E.M. and their family visited the Disney Parks many times, including both Walt Disney World and Disneyland.

249.  Before Disney's Disability Access Service was released in October 2013, J.M. carried the red card associated with the Guest Assistance Card service, and she was admirably accommodated.  The GAC only needed to be obtained once in a 14 day period; it did not require daily visits to Guest Relations to discuss the accommodations Disney might be willing to extend that day.  During those visits, J.M. exhibited a nature and extent of joy that she rarely showed in any other setting.  E.M. was always proud and joyful of the opportunity to bring to her beloved daughter a level of happiness which she rarely showed elsewhere.

250. Until October of 2013, E.M. appreciated how the Disney employees comforted the family, never making the family feel as if someone in the family was different or under-privileged. For example, when E.M. first took J.M. to Magic Kingdom in January 2011, when J.M. was five years old, E.M. took J.M. to Meet Cinderella, showed her Guest Assistance Card and explained to the Disney employee that J.M. had verbal apraxia and was exceedingly withdrawn and reserved. In an instant, the Disney employee took everyone else out of the room, leaving only E.M., J.M., and Cinderella, creating one magical moment that was so special to J.M. that E.M. began to cry.

251. Magical moments like these, before October 2013, induced E.M to bring J.M. and the family back to the Parks at least five times per year. The Disney experience was so magical, so special, that E.M. purchased a Disney Vacation Club property in August 2013.

252. For J.M. and E.M., a typical visit to Disney during the prior GAC system was a delightful adventure. E.M. specifically planned their trips around the special needs of her children. This was easy to do with Disney's prior GAC system. For example, most activities were planned to be completed before 5:00 p.m., when the park would be the busiest, as everyone was rushing to eat. The day typically started at Guest Relations to receive the GAC, with no lines and no waiting. E.M. always felt happy to have a normal vacation without the typical stresses life presents when you are the parent of two cognitively disabled children (E.M.'s son, S.M., is also autistic). It was a unique time for E.M. and J.M. to bond as mother and daughter.

253. J.M.'s cognitive impairments manifest themselves in a certain way during her visits to the Parks; J.M. likes to experience the Parks in a specific order, limited to only certain rides and experiences. J.M.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

sees herself as a "princess," and is incapable of deviating from riding specific rides or experiencing and meeting certain characters, such as Bibbidi Bobbidi Boutique, My Disney Girl's Perfectly Princess Tea Party, and Cinderella.

254.  In October of 2013, Disney rolled out the Disability Access Service and abandoned its prior level of accommodation to J.M.  J.M. could no longer enjoy her "princess" experiences, especially since every visit to Magic Kingdom would have to start with an extended wait at Guest Relations in order for E.M. to request additional, "one-time only" accommodations in accordance with Disney's new DAS policies.   Suddenly, Disney no longer provided individualized attention to persons with cognitive impairments, and the Magic disappeared.

255.  Due to J.M.'s cognitive impairment, J.M. does not and cannot understand the concept of deliberately waiting for a pleasurable experience.  As is true of any mother of a cognitively disabled child, E.M. has become very familiar with J.M.'s hyperactivity and oppositional defiance.  She has learned that she must protect J.M. from exactly the experience which Disney insists upon inflicting upon J.M. – idle wait times and inconsistent ride sequences and experiences.

256.  The family has tried to test J.M.'s ability to idly wait in a queue, and her ability to experience attractions in differing orders.  J.M. tends to suffer meltdowns in such situations.  As Disney knows while feigning ignorance, it can literally take days to transition someone like J.M. from an over-stimulation and meltdown experience.  During the family's most recent trip to Disney, J.M. did not recuperate from her

1  first-day meltdown in time to go to the Parks on the second day, as a

2  result of Disney's discriminatory treatment of J.M.

257. The family's first visit during the DAS card period occurred
November 11, 2013.  Immediately upon arriving at Magic Kingdom,
E.M. went to Guest Relations.  She began explaining the special needs
of both of her children.  Upon mentioning that her children may also
"need a wheelchair," the employee put his hand in her face and said
they "did not need the disability pass."  E.M. took her children and
left immediately, feeling insulted and disturbed by the treatment she
had received from the Disney employee.

258. After this experience during the November 2013 trip, E.M. did not
return to any Walt Disney World Parks.  Instead of being subjected
to further discrimination, they returned to their hometown in Ohio.

259. Previously, E.M. was planning another visit to Walt Disney World at
the end of December 2013.  Once E.M. returned home to Ohio, she
contacted Disney by telephone and email to describe the treatment
she received and to ensure they would be properly accommodated
during their return visit in December.

260. Justin Patterson of Walt Disney World Resort's Guest Experience
Services replied on December 7, 2013, and assured E.M. that
"accommodations can be made by visiting any of our four Theme
Park Guest Relations locations.  Unfortunately, we are not able to
prearrange any accommodations before your visit."  However, on
December 13, 2013, the same Justin Patterson of Walt Disney World
Resort's Guest Experience services emailed E.M. stating "Our
commitment to ensuring our Guests with special needs have a great
experience is a top priority.  I would like to also reassure you we will

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

1    take care of you and your family's specific needs…Our Cast Members

2    will be happy to assist you and discuss your individual situation."

3    261.  Patterson's communications reflect Disney company policy: Disney

4         will not tell a guest how he or she might be accommodated until the

5         guest actually arrives at one of the Parks.  Disney knows this policy

6         prevents families from knowing, until after they have committed

7         thousands of dollars and traveled hundreds or thousands of miles,

8         how or whether they will be accommodated.  Disney knows this

9         policy will deter families from bringing their "invisible disabilities"

10        into the Parks.

11   262.  On this occasion, E.M. was not deterred; she returned to Walt Disney

12        World with her children from December 25, 2013 to January 3, 2014.

13        Again, upon arrival at Magic Kingdom, E.M. went to Guest Relations

14        and explained her children's special needs; an intolerance for idle

15        wait times.  While E.M. received a Disability Access Service card for

16        J.M. and three Fast Passes, Guest Relations had no knowledge of any

17        pre-arranged accommodations, as Justin Patterson indicated.  As it

18        turned out, their file only stated "accommodate if needed."

19   263.  E.M. had to pay for their babysitter to accompany her during this

20        visit, to assist her with her children.  The experience lacked the

21        Magic of prior Disney trips, as E.M. and the babysitter spent their

22        time running around Magic Kingdom arranging for wait times for

23        E.M.'s children.  This need to chart all activities in advance – not in

24        advance of the trip, but only in advance of particular attractions,

25        because Disney policy does not permit disabled persons to plan in

26        advance of a trip – left J.M. unable to experience the park in a

27        tolerable sequence.  The same is also true for E.M.'s other child, who

28

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

also has cognitive impairments. Put simply, the trip was a nightmare.

264. After implementation of the DAS system, E.M. noticed a markedly different Disney attitude and a very different Disney employee. Disney Parks' employees repeatedly referred to E.M. and her children as "you people." One example: a Disney employee actually told E.M. they had to use "special pens to write down times for *you people.*" For E.M. and her children, the "Magic" had disappeared from the Disney experience, replaced by a campaign of disrespect and discrimination.

265. J.M. suffered astonishing mental anguish, emotional trauma, humiliation and embarrassment as a result of Disney's discrimination against her and Disney's treatment of her. E.M. also suffered tragic mental pain and suffering and humiliation and embarrassment as a result of Disney's discrimination against J.M.

266. While E.M. has been back to Disney Parks with J.M. since their un-magical experience in December 2013, the frequency is tapering. E.M. and her family would visit the Parks more often, as before, had Disney not abandoned its past policy of accommodating the special needs of persons with cognitive impairments. Their interest in attending Disney Parks is substantially reduced. Disney was once a loved one, in J.M.'s eyes; as her mother, E.M. must protect J.M. from the confusing, hurtful and destructive experience of suffering discrimination at the hands of a former loved one.

267. Despite this hesitancy, E.M. feels compelled to return to Walt Disney World Parks with J.M. because E.M. purchased a Disney Vacation Club at Saratoga Springs in August of 2013 when Disney issued the GAC and *actually* accommodated E.M. and her family. E.M. paid

$19,000.00 for her Disney Vacation Club timeshare, which she pays at the rate of $433.00 per month, including $300.00 for the loan and $133.00 for the annual Disney Vacation Club dues.

**WHEREFORE**, Plaintiff J.M., through E.M. as her next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of J.M.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

## COUNT 19

### Negligent Infliction of Emotional Distress

### *J.M.  v. Disney*

268.  Plaintiff J.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 244 through 267 above.

269.  During one or more visits to the Parks, J.M. suffered an actual meltdown.

270.  The symptoms and conditions associated with J.M.'s meltdown constitute a physical injury under Florida law.

271.  J.M.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.M. during his patronage of Disney's facilities.  At all material times, Disney knew J.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

272.  J.M.'s meltdown and the treatment which proximately caused J.M. to experience the meltdown caused her grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff J.M., by and through E.M. as J.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon J.M.; and

- Finding such infliction to have caused damages to J.M.; and

- Entering judgment for Plaintiff J.M. in the amount of such damages; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 20

### Intentional Infliction of Emotional Distress
### *J.M. v. Disney*

273. Plaintiff J.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 244 through 267 above.

274. During one or more visits to the Parks, J.M. suffered an actual meltdown.

275. The symptoms and conditions associated with J.M.'s meltdown constitute a physical injury under Florida law.

276. J.M.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of J.M. during his patronage of Disney's facilities.  At all material times, Disney knew J.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

277. J.M.'s meltdown and the treatment which proximately caused J.M. to experience the meltdown caused her grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff J.M., by and through E.M. as J.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

- Finding that Disney intentionally inflicted emotional distress upon J.M.; and

- Finding such infliction to have caused damages to J.M.; and

- Entering judgment for Plaintiff J.M. in the amount of such damages; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding prejudgment interest; and

- Such other relief as this Court may find just and equitable.

## COUNT 21
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *S.M.  v. Disney*

278.  Plaintiff S.M.  incorporates and re-alleges paragraphs 1 through 66, and 68 above.

279.  S.M. has autism.

280.  S.M. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

281.  S.M. is six years old and is generally in the care of her mother, E.M., who brings this action as S.M.'s next friend, parent and natural guardian.

282.  S.M. and E.M. are residents of Lorain County, Ohio.

283.  For many years leading up to October of 2013, from the time S.M. was four or five years old, S.M., E.M. and their family visited the Disney Parks many times, including both Walt Disney World and Disneyland.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

284.  Before Disney's Disability Access Service was released in October 2013, S.M. carried the red card associated with the Guest Assistance Card system, and S.M. was admirably accommodated.  During those visits, S.M. exhibited a nature and extent of joy that he rarely showed in any other setting.  E.M. was always proud and joyful of the opportunity to bring to her beloved son a level of happiness which he rarely showed elsewhere.

285.  Before October 2013, E.M. visited Disney Parks with S.M. at least five times per year.  The Disney experience was equally magical and enjoyable.  So much so that E.M. purchased a timeshare at Disney's Vacation Club in August 2013.

286.  For S.M. and E.M., a typical visit to Disney during the prior GAC system was a delightful adventure.  E.M. specifically planned their trips around the special needs of her children.  This was easy to do with Disney's prior GAC system.  For example, most activities were planned to be completed before 5:00 p.m., when the park would be the busiest, as everyone was rushing to eat.  S.M.'s day typically began with his dad on the monorail, which S.M. has been known to ride for up to four straight hours.  Upon arrival at one of the Parks, S.M. received the GAC, with no lines and no waiting.  E.M. was happy because she felt like she could have a normal vacation without the typical stresses life presents when you are the parent of two cognitively disabled children (E.M.'s daughter, J.M., is also autistic).  It was a unique time for E.M. and S.M. to bond as mother and son.

287.  In October of 2013, Disney rolled out the Disability Access Service and abandoned its prior level of accommodation to S.M.  Suddenly, Disney no longer provided individualized attention to persons with cognitive impairments, and the Magic disappeared.  For example,

Page 89

now E.M. was required to go to Guest Relations before every visit to Magic Kingdom in order to ask for additional accommodations, pursuant to new DAS policies. Now every "one-time only" accommodation really did have to be repeated every day.

288. S.M.'s cognitive impairments manifest themselves in a certain way during his visits to the parks; S.M. is a "repeat rider." This is a propensity common among autistic persons – a variety of the need for consistency, order and routine. S.M. will experience a particular ride or attraction over and over, for several hours at a time. Disney personnel are very familiar with the repeat rider type of guest, in that they have discussed such guests with E.M. during E.M.'s and S.M.'s visits to the Parks. For example, S.M. loves the Magic Carpet Ride, Big Thunder Mountain Railroad, and Splash Mountain. It is necessary that S.M. rides these rides repeatedly – this is how S.M. must experience the Magic of Magic Kingdom. If he is unable to repeat a ride, such as Big Thunder Mountain Railroad, he will experience a meltdown.

289. Due to S.M.'s cognitive impairment, S.M. cannot tolerate long lines or long idle wait times. As is true of any mother of a cognitively disabled child, E.M. has become very familiar with S.M.'s impulsivity and stimming activity, which includes the repetition of words and phrases in conjunction with a rocking motion. She has learned that she must protect S.M. from exactly the experience which Disney insists upon inflicting upon S.M. – idle wait times and inconsistent ride sequences and experiences.

290. The family has occasionally tested S.M.'s ability to idly wait in a queue, and his ability to experience attractions and rides in differing orders. In these situations, S.M.'s stimming increases after only a

DOGALI LAW GROUP, P.A.

few minutes, at which time he begins to repeat "I want to go now!" while rocking or spinning in a circle with both hands, after which a meltdown will ensue if left in that situation.  After a meltdown, S.M. emotionally shuts down, retreats completely inward, and requires hours to return to a any semblance of a calm and peaceful state.

291.  The family's first visit during the DAS card period occurred November 11, 2013.  Immediately upon arriving at Magic Kingdom, E.M. went to Guest Relations.  She began explaining the special needs of both of her children.  Upon mentioning that her children may also "need a wheelchair," the employee put his hand in her face and said they "did not need the disability pass."  E.M. took her children and left immediately, feeling insulted and disturbed by the treatment she had received from the Disney employee.

292.  After this experience during the November 2013 trip, E.M. did not return to the Walt Disney World Parks.  Instead of being subjected to further discrimination, they returned to their hometown in Ohio.

293.  Previously, E.M. was planning another visit to Walt Disney World at the end of December 2013.  Once E.M. returned home to Ohio, she contacted Disney by telephone and email to describe the treatment she received and to ensure they would be properly accommodated during their return visit in December.

294.  Justin Patterson of Walt Disney World Resort's Guest Experience Services replied on December 7, 2013, and assured E.M. that "accommodations can be made by visiting any of our four Theme Park Guest Relations locations.  Unfortunately, we are not able to prearrange any accommodations before your visit."  However, on December 13, 2013, the same Justin Patterson of Walt Disney World Resort's Guest Experience services emailed E.M. stating "Our

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

commitment to ensuring our Guests with special needs have a great experience is a top priority.  I would like to also reassure you we will take care of you and your family's specific needs...Our Cast Members will be happy to assist you and discuss your individual situation."

295.  Patterson's communications reflect Disney company policy: Disney will not tell a guest how he or she might be accommodated until the guest actually arrives at one of the Parks.  Disney knows this policy prevents families from knowing, until after they have committed thousands of dollars and traveled hundreds or thousands of miles, how or whether they will be accommodated.  Disney knows this policy will deter families from bringing their "invisible disabilities" into the Parks.

296.  On this occasion, E.M. was not deterred; she returned to Walt Disney World with her children from December 25, 2013 to January 3, 2014. Again, upon arrival at Magic Kingdom, E.M. went to Guest Relations and explained her children's special needs; an intolerance for idle wait times.  While E.M. received a Disability Access Service card for J.M. and three Fast Passes, Guest Relations had no knowledge of any pre-arranged accommodations, as Justin Patterson indicated.  As it turned out, their file only stated "accommodate if needed."

297.  E.M. had to pay for their babysitter to accompany her during this visit, to assist her with her children.  The experience lacked the Magic of prior Disney trips, as E.M. and the babysitter spent their time running around Magic Kingdom arranging for wait times for E.M.'s children.  This need to chart all activities in advance – not in advance of the trip, but only in advance of particular attractions, because Disney policy does not permit disabled persons to plan in advance of a trip – left J.M. unable to experience the park in a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

tolerable sequence.  The same is also true for E.M.'s other child, who also has cognitive impairments.  Put simply, the trip was a nightmare.

298.  During their December 2013 visit and since the implementation of the DAS system, E.M. noticed a markedly different Disney experience and discriminatory attitude directed at her children.  Disney employees repeatedly referred to E.M. and her children as "you people."  One employee actually told E.M. they had to use "special pens to write down times for *you people.*"  For E.M. and her children, the "Magic" was missing from their Disney experience.  It had been instead replaced with a campaign of discrimination and overall un-accommodation.

299.  S.M., more self-aware than many autistic children, suffered astonishing mental anguish, emotional trauma, humiliation and embarrassment as a result of Disney's discrimination against him and Disney's treatment of him. E.M. also suffered tragic mental pain and suffering and humiliation and embarrassment as a result of Disney's discrimination against S.M.

300.  While E.M. has been back to Disney Parks with S.M. since their un-magical experience in December 2013, the frequency is tapering. E.M. and her family would visit the Parks more often, as before, had Disney not abandoned its past policy of accommodating the special needs of persons with cognitive impairments.  Their interest in attending Disney Parks is substantially reduced.  Disney was once a loved one, in S.M.'s eyes; as his mother, E.M. must protect S.M. from the confusing, hurtful and destructive experience of suffering discrimination at the hands of a former loved one.

301.  Despite this hesitancy, E.M. feels compelled to return to Walt Disney World Parks with J.M. because E.M. purchased a Disney Vacation Club at Saratoga Springs in August of 2013 when Disney issued the GAC and *actually* accommodated E.M. and her family.   E.M. paid $19,000.00 for her Disney Vacation Club timeshare, which she pays at the rate of $433.00 per month, including $300.00 for the loan and $133.00 for the annual Disney Vacation Club dues.

**WHEREFORE**, Plaintiff S.M., through E.M. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of S.M. 's disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Such other relief as this Court may find just and equitable.

## COUNT 22

### Negligent Infliction of Emotional Distress

### *S.M.  v. Disney*

302. Plaintiff S.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 279 through 301 above.

303. During one or more visits to the Parks, S.M. suffered an actual meltdown.

304. The symptoms and conditions associated with S.M.'s meltdown constitute a physical injury under Florida law.

305. S.M.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of S.M. during his patronage of Disney's facilities.  At all material times, Disney knew S.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

306. S.M.'s meltdown and the treatment which proximately caused S.M. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.M., by and through E.M. as S.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon S.M.; and

- Finding such infliction to have caused damages to S.M.; and

- Entering judgment for Plaintiff S.M. in the amount of such damages; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding prejudgment interest; and

- Such other relief as this Court may find just and equitable.

## COUNT 23
### Intentional Infliction of Emotional Distress
### *S.M. v. Disney*

307. Plaintiff S.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 279 through 301 above.

308. During one or more visits to the Parks, S.M. suffered an actual meltdown.

309. The symptoms and conditions associated with S.M.'s meltdown constitute a physical injury under Florida law.

310. S.M.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of S.M. during his patronage of Disney's facilities.  At all material times, Disney knew S.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

311. S.M.'s meltdown and the treatment which proximately caused S.M. to experience the meltdown caused him grave and extreme mental

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.M., by and through E.M. as S.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon S.M.; and
- Finding such infliction to have caused damages to S.M.; and
- Entering judgment for Plaintiff S.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 24
### Breach of Contract
#### *E.M. v. Disney*

312. Plaintiff E.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, 244 through 267, and 279 through 301 above.

313. E.M., through E.M.'s acquisition of Disney tickets for E.M. and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

314. Disney failed or refused to provide the promised experience, and is in breach of contract.

DOGALI LAW GROUP, P.A.

315.   E.M. incurred monetary costs in purchasing tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.   Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff E.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with E.M.; and
- Entering judgment for Plaintiff E.M. in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

### COUNT 25
### Negligent Infliction of Emotional Distress
### *E.M. v. Disney*

316.   Plaintiff E.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, 244 through 267, and 279 through 301 above.

317.   During one or more visits to the Parks, E.M.'s daughter J.M. and her son S.M. each suffered an actual meltdown while in E.M.'s presence.

318.   The symptoms and conditions associated with J.M. and S.M.'s meltdowns constitute physical injuries to J.M. and S.M. under Florida law.

319.   J.M. and S.M.'s meltdowns in the Parks were proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.M.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

and S.M. during their patronage of Disney's facilities.  At all material times, Disney knew J.M. and S.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

320.   E.M. directly observed the stressors leading up to the meltdowns, J.M. and S.M.'s resulting escalation, and the meltdowns.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her daughter and son, E.M. could do nothing reasonable to prevent the meltdowns.

321.   E.M.'s observation of J.M. and S.M.'s meltdowns and of the outrageous conduct and treatment which proximately caused J.M. and S.M. to experience the meltdowns caused E.M. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff E.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon E.M.; and
- Finding such infliction to have caused damages to E.M.; and
- Entering judgment for Plaintiff E.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOGALI LAW GROUP, P.A.

## COUNT 26

### Intentional Infliction of Emotional Distress

### *E.M. v. Disney*

322. Plaintiff E.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, 244 through 267, and 279 through 301 above.

323. During one or more visits to the Parks, E.M.'s daughter J.M. and her son S.M. each suffered an actual meltdown.

324. The symptoms and conditions associated with J.M. and S.M.'s meltdowns constitute physical injuries under Florida law.

325. J.M. and S.M.'s meltdown in the Parks were proximately caused by Disney's outrageous, unlawful and reckless treatment of J.M. and S.M. during their patronage of Disney's facilities.  At all material times, Disney knew J.M. and S.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

326. E.M. directly observed the stressors leading up to the meltdowns, J.M. and S.M.'s resulting escalation, and the meltdowns.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her daughter and son, E.M. could do nothing reasonable to prevent the meltdowns.

327. E.M.'s observation of J.M. and S.M.'s meltdowns and of the outrageous conduct and treatment which proximately caused J.M. and S.M. to experience the meltdowns caused E.M. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff E.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon E.M.; and
- Finding such infliction to have caused damages to E.M.; and
- Entering judgment for Plaintiff E.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 27

### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *J.K. v. Disney*

328. Plaintiff J.K. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

329. J.K. has autism.  He is nonverbal, confined to an adaptive stroller in public for issues of containment, and has issues with elopement.

330. J.K. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

331. J.K. is 12 years of age and is generally in the care of his mother, R.K., who brings this action as J.K.'s next friend, parent, and natural guardian.

332. J.K. and R.K. are residents of Prince William County, Virginia.

333. J.K. first visited Magic Kingdom in March 2006 when he was four years old.  The experience was a magical one.  After the first visit, J.K

DOGALI LAW GROUP, P.A.

1
2

and his mother have returned to Walt Disney World on multiple occasions.

3
4
5
6
7
8
9

334.  Before Disney's Disability Access Service was released in October, 2013, S.M. carried the red card associated with the Guest Assistance Card service, and he was admirably accommodated.  During those visits, J.K. exhibited a nature and extent of joy that he rarely showed in any other setting.  R.K. was always proud and joyful of the opportunity to bring to her beloved son a level of happiness which he rarely showed elsewhere.

10
11
12
13
14

335.  During those visits, R.K. was enamored by the way Disney employees accommodated J.K., making him feel exceptional and accepted. Disney had strong mechanisms in place to ensure J.K. and R.K. were accommodated in an expedient manner.  The Guest Assistance Card made wait times manageable for J.K.

15
16
17
18
19
20

336.  The Guest Assistance Card and program also allowed R.K. to predict the accommodations which would be afforded to J.K.  She could confidently commit the family's resources to a planned vacation to the Parks.  For J.K. and R.K., before the DAS system, a large part of the Magic was *the accommodation itself*.  J.K. was always treated with care and respect, and was not subjected to discrimination.

21
22
23
24
25
26
27

337.  Before October 2013, a typical visit to Walt Disney World Parks for J.K. and R.K. was a magical experience.  Upon arriving at Guest Relations at Magic Kingdom, J.K. received the Guest Assistance Card, without an extended wait and without having his picture taken. After entering Magic Kingdom, wait times were reasonable and J.K. was never stigmatized.  J.K. and R.K. traveled the parks at a pace comfortable to J.K.

28

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

338. After receiving the Guest Assistance Card at Guest Relations, J.K.'s day typically began in Fantasyland and always ended with a visit to Tomorrowland Speedway and The Many Adventures of Winnie the Pooh.  J.K. and R.K. typically enjoyed the Parks for an entire day, enjoying their time to bond as mother and son.

339. As is common among autistic persons, J.K. has no concept of time, including past or future.  J.K. is incapable of understanding the idea of waiting for something, or delayed gratification, two important requirements for surviving a Disney queue.

340. When J.K. encounters too much stimulation, he exhibits a stimming pattern which includes flapping his hands, squealing, trying to escape, and grabbing persons nearby.  When J.K. is over-stimulated, he is prone to run off, or elope.  For these reasons, J.K. wears a Project Lifesaver Protect and Locate or LoJack-type device at all times, and R.K. often enhances the accommodation afforded J.K. in crowds or public places by placing him in an adaptive stroller.  If J.K. reaches the point of meltdown, he will begin screaming, crying, and slapping himself in the face while running around.  Recovery usually requires an extended period of silence and solitude for J.K.

341. J.K.'s cognitive impairments manifest themselves in a certain way during his visits to the Parks.  J.K. is incapable of deviating from riding specific rides such as Tomorrowland Speedway or The Many Adventures of Winnie the Pooh.  The propensity to over-stimulate is aggravated by being placed among a large group of people in a small space.

342. Like most parents of autistic children, R.K. knows her child's stimming, tics, and tendencies.  She knows the stimuli that are likely to overwhelm him.   And she does not permit these stimuli to

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

overwhelm him – no parent will permit a child to experience a meltdown if it can be avoided.

343. R.K. learned about Disney's plan to implement the DAS shortly before the DAS was rolled out.  To gain more information and to cooperate with Disney's anticipated efforts to accommodate J.K.'s special needs, R.K. sent an email to a number of Disney executives on September 30, 2013.  She explained J.K.'s disability and how Disney's planned DAS system would not accommodate him and likely ruin the Disney experience for J.K. and other disabled guests.  She begged executives to reconsider the elimination and replacement of the Guest Assistance Card system because of the impact it would have on the autistic community as a whole.

344. R.K received a response on October 3, 2013 which merely acknowledged R.K.'s email without any further indication that Disney was taking her concerns seriously.  To this date she has received no explanation for Disney's abandonment of its prior policy of accommodating persons with cognitive impairments.

345. After Disney released the DAS on October 9, 2013, R.K. continued to learn more about the DAS as other persons in the autism community visited the Parks and made their awful experiences and their disdain for the new system known.  R.K. reasonably decided to cancel her family's planned trip to Walt Disney World, which was to occur in July 2014.  The DAS continues to deter R.K. and J.K. from returning to Walt Disney World, because R.K. knows the DAS will cause J.K.'s stimming and elopement behaviors to increase.  The entire trip would consist exclusively of a constant effort to short-circuit meltdowns before they occur.

346. J.K. and R.K. have not visited the Parks since October of 2013. R.K. knows they should avoid attending the Parks in the future due to the expectation that the experience will likely be an un-accommodating one and due especially to the risk that the experience will be destructive for J.K.

347. Despite this deep parental fear, R.K. is conflicted because she knows J.K. has adored Disney since he first saw Cinderella's Castle, and the adoration never abated during the time Disney, through its Guest Assistance Card system, actually accommodated persons with cognitive impairments. She has seen J.K. regularly spend hours in his bedroom, staring at maps of Walt Disney World and studying YouTube videos of Disney's California Adventure. J.K.'s love of Disney is so strong, his greatest wish is to visit Disneyland and finally see Mickey's Fun Wheel in California. R.K. knows she cannot take him there because she knows J.K. will be discriminated against, just as is the case at Walt Disney World.

**WHEREFORE**, Plaintiff J.K., by and through R.K. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of J.K.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and
- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and
- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Such other relief as this Court may find just and equitable.

## COUNT 28
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *D.M. v. Disney*

348. Plaintiff D.M. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

349. D.M. has autism. He is non-verbal and communicates by typing on an iPad.

350. D.M. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

351. D.M. is 14 years of age and is generally in the care of his mother, C.M, who brings this action as D.M.'s next friend, parent and natural guardian.

352. D.M. and C.M. are residents of Polk County, Florida.

DOGALI LAW GROUP, P.A.

353. Year after year, D.M., and C.M., visited the Disney Parks, averaging approximately five visits per year.   During those visits, D.M. exhibited a nature and extent of joy that he rarely showed in any other setting.  C.M. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere.   C.M. was enamored with the way Disney employees interacted with D.M., consistently making him feel exceptional and accepted.

354. Because of these fond memories, D.M. and C.M. became annual passholders of Disney Park(s).

355. Since D.M. was a toddler, his cognitive impairments have manifested themselves in a certain way during his visits to the parks; D.M. is "repeat rider."  This is a propensity common among autistic persons – a variety of the need for consistency, order and routine.  D.M. will experience a particular ride or attraction over and over, such as The Seas with Nemo and Friends, for several hours at a time.  Disney personnel are very familiar with the repeat rider type of guest.

356. D.M. is also incapable of idle waits which last longer than a few minutes.  A significant time spent idly waiting is a stressor which will create escalation toward a meltdown.  D.M's meltdowns include the infliction of injury upon himself.  D.M.'s meltdowns can be quite severe, as he will throw himself on the ground, bite, and/or hit.  As one form of protection against harm from this behavior, D.M. wears padded football pants under his regular clothes to lessen the blows.

357. To enhance the accommodation provided by Disney and provide further protection against stressors which might escalate D.M. toward a meltdown and against the consequences of a potential

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

meltdown, C.M. customarily incurs the expense of a therapist who accompanies them at the Parks.

358. Like most autistic persons, D.M. cannot understand the concept of arriving at a ride and being turned away and invited to return at a later time. As a result, the aspect of Disney's DAS is a stressor which escalates D.M.'s stimming behaviors and increases the risk of meltdowns.

359. On September 25, 2014, C.M. wrote an email to Disney explaining the hardship which the then-anticipated DAS would cause for D.M. and her. Disney failed to modify the policy to meet D.M.'s needs and the needs of others like him. Instead, even with notice of how the DAS would affect D.M., Disney launched the DAS anyway.

360. On October 8, 2013, the day before the release of the DAS system, C.M. and D.M. went to enjoy the Disney Parks.

361. On that day, a Disney employee told them they could expect the new system to provide five fast passes for immediate access. On that last day of the Guest Assistance Card system, D.M. carried his red GAC and was admirably accommodated. Especially during that visit, D.M. exhibited a level of pure happiness which was exhilarating.

362. However, upon returning to the Disney Parks in January 2014, after Disney released the DAS, C.M. was told that D.M. was not in their system and they were not given Fast Passes as Disney had previously represented would be available to them.

363. D.M. experienced several more meltdowns at the Disney Parks that day, considerably more than was ever the case under the GAC. These meltdowns included injuring himself, jumping up in the air and throwing himself down onto the ground.

DOGALI LAW GROUP, P.A.

364. As a result of the Disney's failure to provide reasonable accommodations to D.M. under the new DAS, accommodations that would allow D.M. to have an equally good time as a nondisabled person at the Disney Parks, C.M did not renew her family's annual passes.

365. C.M. contacted Disney about her experience in January 2014. Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate D.M.'s special needs, Disney personnel now offered bizarre and preposterous responses to C.M.'s communications.  When explaining to Disney employees how the old system worked for her son and how the new one does not, Disney employees voiced absurdities to C.M., as well as ridiculously inapplicable truisms, about Disney's systems, or D.M.'s condition, or D.M.'s special needs:

- "You were not using it correctly;"
- "That's not what the pass was originally for;"
- "You were never supposed to have unlimited access;"
- "You will never have unlimited access again;"
- "We have to be fair to our other guests;"
- "The average guest only gets to ride . . ."

366. The assertion that C.M. was not using Disney's accommodations as intended, or that she was using them to achieve some advantage they were not designed to provide, was and is offensive.  C.M. never requested unlimited access to anything, or that other guests be treated unfairly.

367. Notwithstanding these and further efforts by C.M., Disney has shown no willingness or desire to improve the experience for guests like D.M.

368.   C.M. incurred monetary costs in purchasing annual passes to the Parks, and incurred wasted expenses during wasted trips to the Parks, including but not limited to additional fees for D.M.'s therapist, who accompanied them during each Park visit.

369.   D.M. and C.M. have already visited the Parks considerably less frequently than they intended when they purchased the annual pass, a situation which continues to this day.   Their interest in attending Disney Parks is substantially diminished, because C.M. knows the DAS will result in discrimination against D.M. and will create stressors which will escalate him toward meltdown behaviors.

**WHEREFORE**, Plaintiff D.M., by and through C.M. as next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of D.M.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Such other relief as this Court may find just and equitable.

## COUNT 29
### Negligent Infliction of Emotional Distress
### *D.M. v. Disney*

370. Plaintiff D.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 349 through 369 above.

371. During one or more visits to the Parks, D.M. suffered an actual meltdown.

372. The symptoms and conditions associated with D.M.'s meltdown constitute a physical injury under Florida law.

373. D.M.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of D.M. during his patronage of Disney's facilities.   At all material times, Disney knew D.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

374. D.M.'s meltdown and the treatment which proximately caused D.M. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff D.M., by and through C.M. as D.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

- Finding that Disney negligently inflicted emotional distress upon D.M.; and
- Finding such infliction to have caused damages to D.M.; and
- Entering judgment for Plaintiff D.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 30
### Intentional Infliction of Emotional Distress
### *D.M. v. Disney*

375. Plaintiff D.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 349 through 369 above.

376. During one or more visits to the Parks, D.M. suffered an actual meltdown.

377. The symptoms and conditions associated with D.M.'s meltdown constitute a physical injury under Florida law.

378. D.M.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of D.M. during his patronage of Disney's facilities.  At all material times, Disney knew D.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

379. D.M.'s meltdown and the treatment which proximately caused D.M. to experience the meltdown caused him grave and extreme mental

anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff D.M., by and through C.M. as D.M.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon D.M.; and
- Finding such infliction to have caused damages to D.M.; and
- Entering judgment for Plaintiff D.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

### COUNT 31
### Breach of Contract
### *C.M. v. Disney*

380. Plaintiff C.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 349 through 369 above.

25. C.M., through C.M.'s acquisition of Disney annual passes for C.M. and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

26. Disney failed or refused to provide the promised experience, and is in breach of contract.

27. C.M. incurred monetary costs in purchasing annual passes to the Parks for trips that were entirely wasted, and incurred other

*DOGALI LAW GROUP, P.A.*

expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of contract.

**WHEREFORE**, Plaintiff C.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with C.M.; and
- Entering judgment for Plaintiff C.M. in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 32
### Negligent Infliction of Emotional Distress
### *C.M. v. Disney*

381. Plaintiff C.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 349 through 369 above.

382. During one or more visits to the Parks, C.M.'s beloved son D.M. suffered an actual meltdown while in C.M.'s presence.

383. The symptoms and conditions associated with D.M.'s meltdown constitute a physical injury to D.M. under Florida law.

384. D.M.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of D.M. during his patronage of Disney's facilities.  At all material times, Disney knew D.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

DOGALI LAW GROUP, P.A.

385. C.M. directly observed the stressors leading up to the meltdown, D.M.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, C.M. could do nothing reasonable to prevent the meltdown.

386. C.M.'s observation of D.M.'s meltdown and of the outrageous conduct and treatment which proximately caused D.M. to experience the meltdown caused C.M. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff C.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon C.M.; and
- Finding such infliction to have caused damages to C.M.; and
- Entering judgment for Plaintiff C.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 33
### Intentional Infliction of Emotional Distress
### *C.M. v. Disney*

387. Plaintiff C.M. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 349 through 369 above.

DOGALI LAW GROUP, P.A.

388. During one or more visits to the Parks, C.M.'s beloved son D.M. suffered an actual meltdown.

389. The symptoms and conditions associated with D.M.'s meltdown constitute a physical injury under Florida law.

390. D.M.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of D.M. during his patronage of Disney's facilities.  At all material times, Disney knew D.M. to be vulnerable to emotional injury if treated in such a manner by anyone.

391. C.M. directly observed the stressors leading up to the meltdown, D.M.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, C.M. could do nothing reasonable to prevent the meltdown.

392. C.M.'s observation of D.M.'s meltdown and of the outrageous conduct and treatment which proximately caused D.M. to experience the meltdown caused C.M. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff C.M. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon C.M.; and
- Finding such infliction to have caused damages to C.M.; and
- Entering judgment for Plaintiff C.M. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and

- Such other relief as this Court may find just and equitable.

## COUNT 34
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *J.C. v. Disney*

393. Plaintiff J.C. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

394. J.C. has autism.

395. J.C. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

396. J.C. is seven years old and is generally in the care of his mother, L.C., who brings this action as J.C.'s next friend, parent and natural guardian.

397. J.C. and L.C. are residents of Polk County, Florida.

398. L.C. and her family have been Disney passholders for about 20 years. For about the first half of this time they lived in the Boston area; about a decade ago they moved to Central Florida for two principal reasons – to be closer to certain family members, and to be closer to the Disney Parks.

399. L.C. and J.C. and their family have always attended the Disney Parks with great frequency.  They are especially active in the Disney Star Wars events and weekends activities.  J.C. has been visiting the Parks at Walt Disney World for many years, since he was an infant, and the Disney experience, at least in its pre-October 2013 form, has been a large part of his life.  J.C.'s first spoken word was "monorail."

DOGALI LAW GROUP, P.A.

400. Year after year, J.C. and L.C. and their family frequently visited the Parks, averaging approximately five visits per year. During those visits, J.C. exhibited a nature and extent of joy that he rarely showed in any other setting. L.C. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere. L.C. was touched by the way Disney employees interacted with J.C., consistently making him feel exceptional and accepted.

401. When J.C. was four or five years old, a Disney employee told L.C. and her husband about a special pass which was available to J.C., so that J.C. could avoid the waits, idle time, and the crowds of Disney's queues.

402. Thereafter, for the few years leading up to October of 2013, the family simply reported to City Hall, told the Disney employee that J.C. is autistic and could not tolerate idle waits or lines, and promptly obtained a pass, the Guest Assistance Card, with no questions or hassle.

403. During that time, L.C. routinely brought along documentation to demonstrate J.C.'s formal diagnosis. When offered, the Disney employee simply advised that the documentation was not necessary; the employee did not need to see it.

404. In advance of their first visit after October 9, 2013, L.C. and her family learned about Disney's new program. Internet sites showed widespread disdain for Disney's changes. Since that date, the family has visited Walt Disney World a few times, but much less frequently than they would have had Disney not abandoned its prior practice of caringly accommodating the needs of persons with cognitive impairments. J.C. and his family previously visited the Parks more

DOGALI LAW GROUP, P.A.

than weekly, likely twice per week.  Such frequency is no more, and will decline, if Disney's intolerance for cognitive impairments does not change.

405.  Several Disney employees have told L.C. and her husband that the Disney employees themselves are displeased with Disney's newfound intolerance for cognitive impairments.

406.  Since the DAS was rolled out, the Disney employees have a new approach to any offered evidence of autism.  Instead of courteously declining to consider it because doing so is deemed unnecessary, they now advise that they are instructed not to review it; that they are prohibited from reviewing it.

407.  Unwilling to discuss J.C.'s needs, Disney refuses to reasonably modify its DAS to accommodate J.C.

408.  J.C. exhibits many of the same traits as other autistic children, with a few less common conditions as well.  Because J.C. cannot tolerate loud, unexpected noises, he wears headphones to block them out. He is also extremely destabilized by crowds.  If J.C. were to visit a ride and not ride it, J.C. would not cause harm, but he would likely cause disruption or disturbance to those in the immediate vicinity.

409.  Prior to October 9, 2013, J.C. and his family could keep moving through the Parks toward clear visible goals, achieving the goals upon arrival, and J.C.'s behavior was appropriate and calm, and his joy was obvious.  J.C.'s first ride was always Winnie the Pooh, typically followed by two more rides, after which the day was often done.  That's all; just a few rides.

410.  The family's visits since October 9, 2013 have been unpleasant because J.C. lacks the capacity to tolerate idle waits, and Disney has abandoned its accommodation of this incapacity.  J.C. has a regular

DOGALI LAW GROUP, P.A.

1   routine of attractions to visit, and disruption of this sequence is a
2   stressor which escalates his stimming behaviors.   Especially
3   troublesome is going to a ride and being told to come back later; J.C.
4   is simply incapable of understanding why he travels to a ride which
5   he is then prohibited from riding.

6   411.   The first time they visited Walt Disney World after Disney's
7   implementation of the DAS, the family trekked first to the Winnie the
8   Pooh ride, found a 40-minute wait, and were told to come back in 40
9   minutes.   L.C. and her husband tried to explain to Jake that they had
10   to come back later.   They were unsuccessful, and J.C. laid down on
11   the ground and had a meltdown event.

12   412.   During the 40-minute wait time, it was and is impossible for J.C. to
13   go to another ride and ride it, because it upsets his programmed
14   sequence; and it would make matters worse to go to another ride
15   only to get a Fast Pass and then be prohibited from riding *that* ride
16   too, again being told to come back later.

17   413.   Disney's new DAS also causes J.C. to get prematurely physically
18   exhausted in the Parks.   Like most autistic persons, J.C. cannot stop
19   and "browse;" thus the need to keep him rapidly moving during the
20   Disney-imposed wait times exhausts J.C., and, often, his family as
21   well.

22   414.   Since that time, L.C. has learned that even the minimal J.C. routine –
23   three rides – is an exhausting all-day proposition for the family, and
24   it is simply too much for J.C.

25   415.   L.C. and her family have continued to give Disney chances.   On a
26   recent visit to Magic Kingdom they found a 60-minute wait for Peter
27   Pan, and L.C. knew the wait would be intolerable, so the family
28   simply left the park.

DOGALI LAW GROUP, P.A.

416. On an even more recent visit, the family trekked to the Winnie the Pooh ride, where they found a long wait and were told to come back later.  In reaction, J.C. had a meltdown episode.

417. This event was consistent with J.C.'s other times at the park; there is a point in time that he can idly wait, but it is nowhere near the 45 or more minutes which Disney apparently proudly accepts as the baseline for all its guests.

418. Since the meltdown on the Winnie the Pooh ride, the family has avoided returning to the Parks because J.C. cannot grasp the concept of waiting idly for something to happen in such a fun and lively place as Walt Disney World.  He reacts to extended waits the same way every time.  After a few minutes the idle wait becomes a stressor, and he will become agitated, jump up and down, and wildly spin his arms around.

419. L.C. and her husband have been staunch Disney fans and passholders for 20 years, the first half of which they lived in Massachusetts.  They always kept fairly abreast of Disney-related events including goings-on at the Parks.  Even so, the first time they ever heard about "abuse" of the Disney Guest Assistance Card system was in 2013.

420. L.C. knows that the DAS system appears to be based upon the premise that one can _reason_ with an autistic child.  Such thinking reflects no knowledge or deliberation about the needs of persons with cognitive impairments.  Obviously, Disney is proud of its ability to habitually induce its non-disabled guests to wait an hour or more for rides, so proud that it believes all persons, regardless of their impairments, must be well-served and thoroughly-accommodated by being subjected to the same wait.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

421.  After more than 20 years, L.C. and her family have resolved that unless Disney's failed accommodations program is modified to fit J.C.'s special needs, they need not take J.C. back to the Parks.  J.C. and L.C. have already visited the Parks considerably less frequently than before. Their interest in attending the Parks is substantially diminished, because L.C. knows the DAS will result in discrimination against J.C. and will create stressors which will escalate him toward meltdown behaviors.

422.  L.C. incurred monetary costs in purchasing annual passes to the Parks, and has incurred wasted expenses during wasted trips to the Parks.

**WHEREFORE**, Plaintiff J.C., by and through L.C. as her next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of J.C.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Such other relief as this Court may find just and equitable.

## COUNT 35
### Negligent Infliction of Emotional Distress
### *J.C. v. Disney*

423. Plaintiff J.C. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 394 through 422 above.

424. During one or more visits to the Parks, J.C. suffered an actual meltdown.

425. The symptoms and conditions associated with J.C.'s meltdown constitute a physical injury under Florida law.

426. J.C.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.C. during his patronage of Disney's facilities.  At all material times, Disney knew J.C. to be vulnerable to emotional injury if treated in such a manner by anyone.

427. J.C.'s meltdown and the treatment which proximately caused J.C. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff J.C., by and through L.C. as J.C.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

DOGALI LAW GROUP, P.A.

- Finding that Disney negligently inflicted emotional distress upon J.C.; and
- Finding such infliction to have caused damages to J.C.; and
- Entering judgment for Plaintiff J.C. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 36

### Intentional Infliction of Emotional Distress
### *J.C. v. Disney*

428. Plaintiff J.C. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 394 through 422 above.

429. During one or more visits to the Parks, J.C. suffered an actual meltdown.

430. The symptoms and conditions associated with J.C.'s meltdown constitute a physical injury under Florida law.

431. J.C.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of J.C. during his patronage of Disney's facilities.  At all material times, Disney knew J.C. to be vulnerable to emotional injury if treated in such a manner by anyone.

432. J.C.'s meltdown and the treatment which proximately caused J.C. to experience the meltdown caused him grave and extreme mental

anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff J.C., by and through L.C. as J.C.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon J.C.; and
- Finding such infliction to have caused damages to J.C.; and
- Entering judgment for Plaintiff J.C. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 37
### Breach of Contract
### *L.C. v. Disney*

433. Plaintiff L.C. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 394 through 422 above.

434. L.C., through L.C.'s acquisition of Disney annual passes for L.C. and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

435. Disney failed or refused to provide the promised experience, and is in breach of contract.

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

436. L.C. incurred monetary costs in purchasing annual passes to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of contract.

**WHEREFORE**, Plaintiff L.C. prays that this Court adjudicate this dispute and enter an Order:

• Finding that Disney breached its contract with L.C.; and

• Entering judgment for Plaintiff L.C. in the amount of her economic monetary damages; and

• Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

• Awarding prejudgment interest; and

• Such other relief as this Court may find just and equitable.

## COUNT 38
### Negligent Infliction of Emotional Distress
### *L.C. v. Disney*

437. Plaintiff L.C. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 394 through 422 above.

438. During one or more visits to the Parks, L.C.'s beloved son J.C. suffered an actual meltdown while in L.C.'s presence.

439. The symptoms and conditions associated with J.C.'s meltdown constitute a physical injury to J.C. under Florida law.

440. J.C.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.C. during his patronage of Disney's facilities.  At all material times, Disney

DOGALI LAW GROUP, P.A.

knew J.C. to be vulnerable to emotional injury if treated in such a manner by anyone.

441.  L.C. directly observed the stressors leading up to the meltdown, J.C.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, L.C. could do nothing reasonable to prevent the meltdown.

442.  L.C.'s observation of J.C.'s meltdown and of the outrageous conduct and treatment which proximately caused J.C. to experience the meltdown caused L.C. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff L.C. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon L.C.; and
- Finding such infliction to have caused damages to L.C.; and
- Entering judgment for Plaintiff L.C. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.


[REMAINDER OF PAGE INTENTIONALLY BLANK]

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT 39

### Intentional Infliction of Emotional Distress
### *L.C. v. Disney*

443. Plaintiff L.C. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 394 through 422 above.

444. During one or more visits to the Parks, L.C.'s beloved son J.C. suffered an actual meltdown.

445. The symptoms and conditions associated with J.C.'s meltdown constitute a physical injury under Florida law.

446. J.C.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of J.C. during his patronage of Disney's facilities.  At all material times, Disney knew J.C. to be vulnerable to emotional injury if treated in such a manner by anyone.

447. L.C. directly observed the stressors leading up to the meltdown, J.C.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, L.C. could do nothing reasonable to prevent the meltdown.

448. L.C.'s observation of J.C.'s meltdown and of the outrageous conduct and treatment which proximately caused J.C. to experience the meltdown caused L.C. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff L.C. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon L.C.; and

- Finding such infliction to have caused damages to L.C.; and
- Entering judgment for Plaintiff L.C. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 32
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *T.P. v. Disney*

449. Plaintiff T.P. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

450. T.P. has been diagnosed with autism, severe obsessive compulsive disorder (OCD), attention deficit hyperactivity disorder (ADHD), and is subject to anxiety attacks.  He becomes particularly anxious when forced to idly wait for more than a few minutes.  Additionally, T.P.'s verbal skills are not well-developed.  Behavioral meltdowns for T.P. consist generally of aggressive behavior directed towards his mother, which may include pulling at her hair.

451. T.P. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

452. T.P. is 12 years old and is generally in the care of his mother, S.P. who brings this action as T.P.'s next friend, parent and natural guardian.

453. T.P. and S.P. are residents of the City of Norwalk in Los Angeles County, California.

DOGALI LAW GROUP, P.A.

454.   T.P. loves Disney unconditionally.  It is his only true social skill, and the only thing T.P. wants to discuss with others.  T.P. will talk at length about anything Disney, including his favorite attractions, the Parks, the movies, the characters, and most importantly, his next visit and what he is going to do while he is there.

455.   Indeed, for much of his childhood T.P. has visited Disneyland with his brother and S.P.  T.P. carried the Guest Assistance Card, and he was admirably accommodated.  During those visits, T.P. exhibited a nature and extent of joy that he rarely showed in any other setting.  S.P. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which he rarely showed elsewhere.

456.   In July 2013 T.P. and S.P. obtained season passes for Disneyland.  T.P. and S.P. visited the Disney parks six to eight times between July 2013 and October 2013.  T.P. only experienced one behavioral meltdown during his visits to Disneyland prior to October 2013.

457.   Since T.P. was a toddler, his cognitive impairments have manifested themselves in a certain way during the family's visits to the Parks.  T.P. must experience the park in a specific order, so that disruptions in his planned routine will tend to escalate his stimming behaviors toward meltdowns.  T.P. has a strict schedule in his head of the Disneyland rides he must ride, and the order in which he *must* ride them.  Deviation from *that* order will likely lead to a meltdown.  For example, T.P.'s favorite Disneyland attraction is It's a Small World.  If T.P. were to visit Disneyland and visit It's a Small World immediately upon arriving, and not be afforded the opportunity to ride *that* ride at *that* time, he would likely experience a meltdown.

458.   Similarly, if T.P. were required to idly wait for entry into a ride or attraction for more than a few minutes he also would likely melt down.

DOGALI LAW GROUP, P.A.

During the wait, his behaviors – anxiety, aggression toward his mother, echolalia (the repetition of certain phrases over and over again) would escalate in frequency or severity.   If he is not removed from the condition, a meltdown will occur.

459.  Because T.P. is incapable of understanding the concept of visiting a ride or attraction only to be prohibited from riding it until a future time, the new DAS creates avoidable stressors for T.P., escalating his stimming patterns toward meltdowns, in high traffic areas of the park.   Since Disney's implementation of the new DAS, T.P. has experienced several meltdowns at Disneyland.   Two of these meltdowns were so bad S.P. had to remove T.P. from the park due to the potential of T.P. hurting himself, S.P., and others.

460.  Due to its failure to accommodate which leads to an increased propensity for T.P. experiencing a meltdown, Defendant has prevented T.P. from experiencing the full enjoyment of its Parks, equal to the experiences of persons without a disability.

461.  Shortly after S.P.'s and T.P.'s October 20, 2013 visit to Disneyland, S.P. wrote an email to Disney explaining the hardship the newly implemented DAS causes her and T.P.   Disney refused or failed to reasonably modify the policy for the needs of T.P. and others like him. S.P. has contacted Disney Guest Relations and certain Disney employees, including Mark Jones, expressing her frustration and need for an individual accommodation.   Their only response was to reiterate the need to "try it out," without mention that accommodation would *actually* be made, and the suggestion that she begin the process to cancel their annual passes.

462.  After October 9, 2013, T.P. no longer received the type of accommodation and attention T.P. and S.P. had received when they

DOGALI LAW GROUP, P.A.

visited the Parks in the past.  Specifically, since October 9, 2013, T.P. and S.P. have been to the Disneyland Parks, including Disneyland in Anaheim, six times, most recently on February 17, 2014.  The DAS has specifically adversely impacted T.P. because additional time must be expended in line at the start of each visit to obtain the DAS.

463.  As a result of Disney's failure to modify its procedures to reasonably accommodate T.P.'s needs, T.P. and S.P. have been discouraged and deterred from the full use and enjoyment of the park's rides and attractions.  S.P. would visit the Parks with T.P. more often had Disney not abandoned its past policy of accommodating the special needs of persons with cognitive impairments.  Their interest in attending the Parks is substantially reduced.  S.P. knows they should avoid attending the parks in the future due to the expectation that the experience will again be an un-magical and un-accommodating one, and especially due to the risk that the experience will be destructive for T.P.

464.  Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate T.P.'s special needs, Disney personnel have failed to conduct an individualized assessment of T.P.'s capacity to utilize the DAS, and to modify the DAS to allow T.P. to enjoy the same benefits and privileges as non-disabled patrons.

465.  Disney personnel have shown no willingness or desire to improve the experience for guests like T.P.

466.  S.P. incurred monetary costs in purchasing annual pass tickets to the Parks, in addition to annual parking passes and other expenses which were wasted during the family's wasted trips to the Parks.

467.  T.P. and S.P. have already visited the Parks considerably less frequently than they intended when they purchased the annual passes, a situation

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

1   which continues to this day.  Their interest in attending Disney Parks is

2   substantially diminished.

3   WHEREFORE, Plaintiff T.P. by and through S.P., as T.P.'s next friend, parent

4   and natural guardian, prays that this Court adjudicate this dispute and

5   enter an Order:

6   • Enjoining Defendant to cease the practices which are causing

7   discrimination against Plaintiff on account of T.P.'s disability; and

8   • Enjoining Defendant to reasonably modify its policies, practices, and

9   procedures to afford Plaintiff with an opportunity to experience

10   Disney's goods, services, facilities, privileges, advantages, and

11   accommodations; and

12   • Establishing Court-approved remedial measures that Disney must

13   implement, to prevent Disney from further discriminating against

14   Plaintiff when they visit the Disney Parks; and

15   • Establishing Court-approved requirements for information

16   dissemination about Disney's remedial measures and modified

17   policies, to prevent Disney from further deterring Plaintiff from

18   visiting Disney Parks as a result of anticipated discrimination; and

19   • Establishing a monitoring program to ensure Disney's compliance

20   with the Court's Orders; and

21   • Awarding reasonable attorney's fees as may be determined by the

22   Court in favor of Plaintiff and against Disney; and

23   • Awarding reasonable litigation costs as may be determined by the

24   Court in favor of Plaintiff and against Disney; and

25   • Such other relief as this Court may find just and equitable.

26

27

28

DOGALI LAW GROUP, P.A.

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

**Count 41**

**Violation of the Unruh Civil Rights Act**

**California Civil Code §§51, 52**

***T.P. v. Disney***

468.   T.P. incorporates and re-alleges paragraphs 1 through 68, and 450 through 467 above.

469.   T.P. is and at all material times has been a disabled person within the meaning of California Government Code 12926(j) by virtue of having cognitive disabilities including autism, as well as ADHD, and anxiety.

470.   Section 51 of the California Civil Code, the Unruh Civil Rights Act, provides protection from discrimination by all business establishments in California, including housing and public accommodations, because of age, ancestry, color, disability, national origin, race, religion, sex and sexual orientation.

471.   Section 52 of the California Civil Code provides that whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 is liable for each and every offense.

472.   Pursuant to California Civil Code Section 51(f), a violation of the ADA also constitutes a violation of California Civil Code Section 51, *et seq.*

473.   The Parks are "business establishments" within the meaning of the California Code Section 51, *et seq.*

474.   Through the acts and omissions described in this Complaint, Disney has violated California Civil Code Section 51 by denying Plaintiff T.P.'s access to Disney's programs, services and activities.   Disney has instituted and continues to utilize policies which deny or which aid or incite the denial of Plaintiff's full and equal enjoyment of Disney's public accommodations in the same manner as non-disabled persons.

DOGALI LAW GROUP, P.A.

Disney refuses to modify its policies and procedures to permit fair enjoyment of its facilities by Plaintiff. As a direct and proximate result of the afore-mentioned acts and omissions, Plaintiff has suffered, and continues to suffer, hardship, humiliation and anxiety due to Disney's failure to provide reasonable accommodations and access as are required by Plaintiff's cognitive impairments.

475. Due to the continuous nature of Disney's ongoing discriminatory conduct, declaratory and injunctive relief are appropriate. Moreover, as a result of Defendant's action, Plaintiff is suffering irreparable harm, and thus immediate relief is appropriate.

**WHEREFORE**, Plaintiffs T.P. prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiffs on account of T.P.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiffs with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiffs when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiffs from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance

DOGALI LAW GROUP, P.A.

with the Court's Orders; and

- Entering judgment for Plaintiff T.P. in the amount of his non-economic monetary damages; and

- Entering judgment in favor of Plaintiffs and against Disney for exemplary or punitive damages; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiffs and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiffs and against Disney; and

- Such other relief as this Court may find just and equitable.

### COUNT 42
### Negligent Infliction of Emotional Distress
### *T.P. v. Disney*

476. Plaintiff T.P. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 450 through 467 above.

477. During one or more visits to the Parks, T.P. suffered an actual meltdown.

478. The symptoms and conditions associated with T.P.'s meltdown constitute a physical injury under California law.

479. T.P.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of T.P. during his patronage of Disney's facilities.  At all material times, Disney knew T.P. to be vulnerable to emotional injury if treated in such a manner by anyone.

480. T.P.'s meltdown and the treatment which proximately caused T.P. to experience the meltdown caused him grave and extreme mental

DOGALI LAW GROUP, P.A.

anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff T.P., by and through S.P. as T.P.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon T.P.; and
- Finding such infliction to have caused damages to T.P.; and
- Entering judgment for Plaintiff T.P. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 43

### Intentional Infliction of Emotional Distress
### *T.P. v. Disney*

481. Plaintiff T.P. incorporates and re-alleges the allegations of paragraphs 1 through 67, and 450 through 467 above.

482. During one or more visits to the Parks, T.P. suffered an actual meltdown.

483. The symptoms and conditions associated with T.P.'s meltdown constitute a physical injury under California law.

484. T.P.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of T.P. during his patronage of Disney's facilities.  At all material times, Disney knew

DOGALI LAW GROUP, P.A.

T.P. to be vulnerable to emotional injury if treated in such a manner by anyone.

485. T.P.'s meltdown and the treatment which proximately caused T.P. to experience the meltdown caused him grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff T.P., by and through S.P. as T.P.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon T.P.; and
- Finding such infliction to have caused damages to T.P.; and
- Entering judgment for Plaintiff T.P. in the amount of such damages;
- Entering judgment in favor of Plaintiffs and against Disney for exemplary or punitive damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 44
### Breach of Contract
### *S.P. v. Disney*

486. Plaintiff S.P. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 450 through 467 above.

487. S.P., through S.P.'s acquisition of Disney annual passes for T.P. and her

DOGALI LAW GROUP, P.A.

family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

488. Disney failed or refused to provide the promised experience, and is in breach of contract.

489. S.P. incurred monetary costs in purchasing annual passes to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of contract.

WHEREFORE, Plaintiff S.P. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with S.P.; and
- Entering judgment for Plaintiff S.P.in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 45

### Negligent Infliction of Emotional Distress

### *S.P. v. Disney*

490. Plaintiff S.P. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 450 through 467 above.

491. During one or more visits to the Parks, S.P.'s beloved son T.P. suffered an actual meltdown while in S.P.'s presence.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

492. The symptoms and conditions associated with T.P.'s meltdown constitute a physical injury to T.P. under California law.

493. T.P.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of T.P. during his patronage of Disney's facilities.  At all material times, Disney knew T.P. to be vulnerable to emotional injury if treated in such a manner by anyone.

494. S.P. directly observed the stressors leading up to the meltdown, T.P.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, S.P. could do nothing reasonable to prevent the meltdown.

495. S.P.'s observation of T.P.'s meltdown and of the outrageous conduct and treatment which proximately caused T.P. to experience the meltdown caused S.P. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.P. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon S.P.; and
- Finding such infliction to have caused damages to S.P.; and
- Entering judgment for Plaintiff S.P. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOGALI LAW GROUP, P.A.

## COUNT 46

### Intentional Infliction of Emotional Distress

### *S.P. v. Disney*

496. Plaintiff S.P. incorporates and re-alleges the allegations of paragraphs 1 through 67, and 450 through 467 above.

497. During one or more visits to the Parks, S.P.'s beloved son T.P. suffered an actual meltdown.

498. The symptoms and conditions associated with T.P.'s meltdown constitute a physical injury under California law.

499. T.P.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of T.P. during his patronage of Disney's facilities.  At all material times, Disney knew T.P. to be vulnerable to emotional injury if treated in such a manner by anyone.

500. S.P. directly observed the stressors leading up to the meltdown, T.P.'s resulting escalation and his meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her son, S.P. could do nothing reasonable to prevent the meltdown.

501. S.P.'s observation of T.P.'s meltdown and of the outrageous conduct and treatment which proximately caused T.P. to experience the meltdown caused S.P. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff S.P. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon S.P.; and

- Finding such infliction to have caused damages to S.P.; and
- Entering judgment for Plaintiff S.P. in the amount of such damages;
- Entering judgment in favor of Plaintiffs and against Disney for exemplary or punitive damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 47
### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *C.M.J. v. Disney*

502. Plaintiff C.M.J. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

503. C.M.J. is diagnosed with severe autism, obsessive compulsive disorder ("OCD"), and severe apraxia of speech.

504. C.M.J. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

505. C.M.J. is eight years old and is generally in the care of his mother, D.L.J., who brings this action as C.M.J.'s next friend, parent and natural guardian.

506. C.M.J. and D.L.J. are residents of Philadelphia, PA.

507. For many years, until several years prior to 2013 and while D.L.J. was herself a child, D.L.J. and her family visited the Parks many times. D.L.J. grew to become an unadulterated fan of Disney.

DOGALI LAW GROUP, P.A.

508. During those years, visiting the Parks was a wonderful experience for D.L.J., even though she herself was disabled.  D.L.J. suffered from MCAD-related myopathy and epilepsy and experienced the Parks in a wheelchair, herself using the red Guest Assistance Card.  D.L.J. was admirably accommodated during her visits to the Parks.

509. D.L.J. anxiously awaited the day, she should be lucky enough to become a mother in the future, that she might get to take her own children there.

510. D.L.J. and her family are a family of very modest means.  They will get few opportunities to experience the Parks.  For quite some time, she has planned a vacation for her family, which she currently hopes will occur in September 2014.

511. Until Disney's DAS was released in October 2013, D.L.J. always heard that Disney admirably accommodated its disabled guests, particularly those with cognitive disabilities.  D.L.J.'s dream of taking her children to Walt Disney World was not restrained, and was in fact enhanced, by her confidence that Disney would support, through its caring accommodations, her efforts to care for her disabled children and give them a magical experience in the Parks.  She was certain Disney would accommodate her children as splendidly as Disney had accommodated D.L.J. when D.L.J. was a child.

512. This drastically changed in October 2013 when Disney rolled out its Disability Access Service.  Immediately upon Disney's release and implementation of those policies and procedures, D.L.J. began to learn the troubling truth about the DAS, as other persons in the autism community visited the Parks and made their awful experiences and their disdain for the new system known.    Since Disney's DAS was released, D.L.J. has become reasonably terrified of

DOGALI LAW GROUP, P.A.

taking C.M.J to the Parks.

513.  Fearful that the September 2014 visit will be an un-accommodating one for her children and a prohibitively and wasteful expense for the family, D.L.J. contacted Disney employees to express her concerns and fears about the potential Disney nightmare which would unfold if she goes forward with the family vacation, hoping Disney would say something to allay her fears.

514.  Disney employees have declined to offer any information to D.L.J. which will give her an understanding of what to expect in September 2014.  She has simply been told that Disney works with families on an individualized basis, so D.L.J. can know nothing about what to expect until she and her family actually arrive at the Parks.

515.  Actually, she can know what to expect, from the experiences of others.   The experiences of other families within the autism community are uniformly awful.  Those experiences establish that when D.L.J. arrives at the Parks, any effort to engage in individualized discussion, with the hope Disney might modify its procedures to accommodate her children, will be ignored.  Instead, they will receive as their "accommodation" the DAS – nothing more, nothing less.  The only "individualized" exception will be that if D.L.J. should begin her vacation by diluting the Magic and complaining loud enough in Guest Relations, she might be thrown a few Fast Passes to shut her up.

516.  A Disney employee told D.L.J. that she could get no more information in advance; she can only come to the Parks, explain her concerns, and try out the DAS.  That employee did not explain why explaining her concerns was a part of the process at all, since the same solution and accommodation would be imposed regardless of whatever

DOGALI LAW GROUP, P.A.

concerns D.L.J. might raise: "try out" the unsuitable DAS.

517.  D.L.J. has not yet cancelled her family's vacation plans.  Absent a change in Disney's DAS or a genuine openness to modifying its DAS to accommodate her family, D.L.J. will have little choice but to shatter her children's dreams by canceling the trip.  An experimental, trial-and-error trip to Florida is not practicable.

518.  C.M.J.'s cognitive impairments manifest themselves in a certain way which, along with the family's experiences at other public events and other theme parks, allows D.L.J. to accurately predict the reasonable accommodations he will need in order to reasonably and enjoyably experience the Parks.  C.M.J.'s web research regarding the Parks will continue for months prior to the visit, and he will have internally programmed a particular sequence.  To avoid stressors which will cause his stimming behaviors to escalate to meltdown, he will need to move through the Parks in that specific, pre-defined order, visiting only certain attractions and rides.

519.  C.M.J. will be unable to tolerate arriving at an attraction or ride and _not_ experiencing it.  That is, he will unquestionably experience a meltdown event if he travels all the way to a ride, following the course he will already have programmed for himself, only to be told he is prohibited from riding it and must return later.  The prohibition will not be because the ride isn't working; there will be no reason which C.M.J. might be able to compute.  When C.M.J. experiences such stressors, his stimming patterns will begin to increase, including uncontrollable crying which will not cease until D.L.J. picks him up and holds him.  If the stimming escalates to meltdown stage, C.M.J. will cry so violently that he will hyperventilate and vomit.

Page 145

DOGALI LAW GROUP, P.A.

1    520.   Over time, as is the case with any mother of a cognitively disabled
2          child, D.L.J. has become very familiar with C.M.J.'s stressors.   One
3          thing she knows to protect C.M.J. from is exactly the experience to
4          which Disney would subject him to – idle wait times and inconsistent
5          ride sequences and experiences.   The family has occasionally tested
6          C.M.J.'s ability to idly wait in a queue or to enjoy anticipated
7          experiences in unanticipated sequences.   C.M.J. is prone to melt
8          down in such situations.

9    521.   D.L.J. would be inclined to visit Disneyland and Walt Disney World
10         Parks with C.M.J., had Disney not abandoned its past policy of
11         accommodating the special needs of persons with cognitive
12         impairments.   Their interest in attending Disneyland and Walt
13         Disney World Parks is substantially reduced.  D.L.J. reasonably feels
14         they should avoid attending the Parks in the future due to the
15         expectation that the experience will be an un-magical, and overall,
16         un-fulfilling one, and especially due to the risk that the experience
17         will be destructive for C.M.J.

18      **WHEREFORE**, Plaintiff C.M.J., through D.L.J. as his next friend, parent
19 and natural guardian, prays that this Court adjudicate this dispute and
20 enter an Order:

21     •    Enjoining Defendant to cease the practices which are causing
22          discrimination against Plaintiff on account of C.M.J.'s disability;
23          and

24     •    Enjoining Defendant to reasonably modify its policies, practices,
25          and procedures to afford Plaintiff with an opportunity to
26          experience Disney's goods, services, facilities, privileges,
27          advantages, and accommodations; and

28     •    Establishing Court-approved remedial measures that Disney must

1  implement, to prevent Disney from further discriminating against
2  Plaintiff when they visit the Disney Parks; and

3  • Establishing Court-approved requirements for information
4  dissemination about Disney's remedial measures and modified
5  policies, to prevent Disney from further deterring Plaintiff from
6  visiting Disney Parks as a result of anticipated discrimination;
7  and

8  • Establishing a monitoring program to ensure Disney's compliance
9  with the Court's Orders; and

10  • Awarding reasonable attorney's fees as may be determined by the
11  Court in favor of Plaintiff and against Disney; and

12  • Awarding reasonable litigation costs as may be determined by the
13  Court in favor of Plaintiff and against Disney; and

14  • Such other relief as this Court may find just and equitable.

**COUNT 48**

**Violation of the Americans with Disabilities Act**

**42 U.S.C. §§12131, *et seq.***

***D.M.J.  v. Disney***

522.  Plaintiff D.M.J. incorporates and re-alleges paragraphs 1 through 66,
and 68 above.

523.  D.M.J. is diagnosed with severe autism and global developmental
delay.

524.  D.M.J. is a person with a disability, as that term is defined in 42 U.S.C.
§12102(1).

525.  D.M.J. is seven years old and is generally in the care of his mother,
D.L.J., who brings this action as D.M.J.'s next friend, parent and

Page 147

natural guardian.

526. D.M.J. and D.L.J. are residents of Philadelphia, PA.

527. For many years, until several years prior to 2013 and while D.L.J. was herself a child, D.L.J. and her family visited the Parks many times.  D.L.J. grew to become an unadulterated fan of Disney.

528. During those years, D.L.J. visiting the Parks was a wonderful experience for D.L.J., even though she herself was disabled.  D.L.J. suffered from MCAD-related myopathy and epilepsy and experienced the Parks in a wheelchair, herself using the red Guest Assistance Card.  D.L.J. was admirably accommodated during her visits to the Parks.

529. D.L.J. anxiously awaited the day, she should be lucky enough to become a mother in the future, that she might get to take her own children there.

530. D.L.J. and her family are a family of very modest means.  They will get few opportunities to experience the Parks.  For quite some time, she has planned a vacation for her family, which she currently hopes will occur in September 2014.

531. Until Disney's DAS was released in October 2013, D.L.J. always heard that Disney admirably accommodated its disabled guests, particularly those with cognitive disabilities.  D.L.J.'s dream of taking her children to Walt Disney World was not restrained, and was in fact enhanced, by her confidence that Disney would support, through its caring accommodations, her efforts to care for her disabled children and give them a magical experience in the Parks.  She was certain Disney would accommodate her children as splendidly as Disney had accommodated D.L.J. when D.L.J. was a child.

532. This drastically changed in October 2013 when Disney rolled out its

DOGALI LAW GROUP, P.A.

Disability Access Service.  Immediately upon Disney's release and implementation of those policies and procedures, D.L.J. began to learn the troubling truth about the DAS, as other persons in the autism community visited the Parks and made their awful experiences and their disdain for the new system known.  Since Disney's DAS was released, D.L.J. has become reasonably terrified of taking D.M.J to the Parks.

533.  Fearful that the September 2014 visit will be an un-accommodating one for her children and a prohibitively and wasteful expense for the family, D.L.J. contacted Disney employees to express her concerns and fears about the potential Disney nightmare which would unfold if she goes forward with the family vacation, hoping Disney would say something to allay her fears.

534.  Disney employees have declined to offer any information to D.L.J. which will give her an understanding of what to expect in September 2014.  She has simply been told that Disney works with families on an individualized basis, so D.L.J. can know nothing about what to expect until she and her family actually arrive at the Parks.

535.  Actually, she can know what to expect, from the experiences of others.  The experiences of other families within the autism community are uniformly awful.  Those experiences establish that when D.L.J. arrives at the Parks, any effort to engage in individualized discussion, with the hope Disney might modify its procedures to accommodate her children, will be ignored.  Instead, they will receive as their "accommodation" the DAS – nothing more, nothing less.  The only "individualized" exception will be that if D.L.J. should begin her vacation by diluting the Magic and complaining loud enough in Guest Relations, she might be thrown a few Fast

DOGALI LAW GROUP, P.A.

1    Passes to shut her up.

2    536.   A Disney employee told D.L.J. that she could get no more information

3    in advance; she can only come to the Parks, explain her concerns,

4    and try out the DAS.  That employee did not explain why explaining

5    her concerns was a part of the process at all, since the same solution

6    and accommodation would be imposed regardless of whatever

7    concerns D.L.J. might raise: "try out" the unsuitable DAS.

8    537.   D.L.J. has not yet cancelled her family's vacation plans.  Absent a

9    change in Disney's DAS or a genuine openness to modifying its DAS

10   to accommodate her family, D.L.J. will have little choice but to

11   shatter her children's dreams by canceling the trip.  An

12   experimental, trial-and-error trip to Florida is not practicable.

13   538.   D.M.J.'s cognitive impairments manifest themselves in a certain way

14   which, along with the family's experiences at other public events and

15   other theme parks, allows D.L.J. to accurately predict the reasonable

16   accommodations he will need in order to reasonably and enjoyably

17   experience the Parks.  D.M.J. will need to experience the Parks in a

18   specific order, limited to only certain rides and experiences he wants

19   to encounter.

20   539.   D.M.J. will be unable to tolerate arriving at a ride and not riding it;

21   upon being told he is prohibited from riding the ride, he will be

22   unable to grasp the future-tense concept of coming back later.  He

23   simply cannot process the notion of present deprivation in exchange

24   for future enjoyment.  This kind of incongruity is a strong stressor

25   for D.M.J.

26   540.   When D.M.J. experiences such stressors, his stimming will

27   commence, repeating "No! No! No!" before escalating directly into a

28   meltdown.  When D.M.J. experiences a meltdown, he screams at the

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

top of his lungs and exhibits violence toward himself and his nearby family, which may include biting, shoving and pushing.

541.   Over time, as is the case with any mother of a cognitively disabled child, D.L.J. has become very familiar with D.M.J.'s stressors.   One thing she knows to protect D.M.J. from is exactly the experience to which Disney would subject him to – idle wait times and inconsistent ride sequences and experiences.   The family has occasionally tested D.M.J.'s ability to idly wait in a queue or to enjoy anticipated experiences in unanticipated sequences.   C.M.J. is prone to melt down in such situations.

542.   D.L.J. would be inclined to visit Disneyland and Walt Disney World Parks with D.M.J., had Disney not abandoned its past policy of accommodating the special needs of persons with cognitive impairments.   Their interest in attending Disneyland and Walt Disney World Parks is substantially reduced.   D.L.J. reasonably feels they should avoid attending the Parks in the future due to the expectation that the experience will be an un-magical, and overall, un-fulfilling one, and especially due to the risk that the experience will be destructive for D.M.J.

**WHEREFORE**, Plaintiff D.M.J., through D.L.J. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of D.M.J. 's disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges,

advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

## COUNT 49

### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *S.G. v. Disney*

543. Plaintiff S.G. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

544. S.G. has severe autism, mitochondrial disease, gastrointestinal and esophageal problems indicative of Crohns Disease, pica disorder, attention deficit hyperactivity disorder (ADHD), and she is assigned an ICD-9-CM code for wandering.

DOGALI LAW GROUP, P.A.

545. S.G. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

546. S.G. is six years old and is generally in the care of her mother, S.M.G, who brings this action as S.G.'s next friend, parent and natural guardian.

547. S.G. and S.M.G. are residents of Dorchester County, South Carolina.

548. S.G. sits in a hyperbaric oxygen chamber two hours each day to assist with her brain and sleep patterns.  During her time in the oxygen chamber, S.G. watches Mickey Mouse on *YouTube,* because she loves all things Disney.

549. S.G. is non-verbal and communicates largely by pointing gestures.

550. In 2011 and 2012, S.G. and S.M.G. visited the Walt Disney World Parks. S.G. carried the red card associated with the Guest Assistance Card system, and she was admirably accommodated.  During those visits, S.G. exhibited a nature and extent of joy that she rarely showed in any other setting.  S.M.G. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which she rarely showed elsewhere.

551. Because of these fond memories, S.G. and S.M.G. made plans to return to Walt Disney World in December 2013.

552. S.G.'s cognitive impairments require certain accommodations in order for S.G. to experience the Disney Parks in a way equal to other, nondisabled children.

553. S.G. is incapable of waiting idly in a line without experiencing a meltdown.  Idle waiting is a stressor which escalates S.G.'s stimming behavior toward meltdown.  S.G.'s stimming often takes the form of excited crying, biting her hand, falling to the ground and banging her head.  She will also make thrusting/humping movements, eat non-edible materials, and scream.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

554.  Although S.G. now has a stroller into which she can be strapped, controlling her is challenging.  The ability to wheel her directly to a ride entrance and promptly place her on the ride avoids many of the challenges associated with S.G.'s disability.

555.  Requiring S.G. to go to the front of a line so her party can get the DAS card signed with a return time, only to then wheel her away with the intention of returning later places S.G. in harm's way, because once S.G. has seen a ride she is incapable of waiting to experiencing it, with or without a line.  Once S.G. has seen a ride, she must then either ride it or melt down.  By refusing to modify its procedures so as to permit S.G. to enter the ride, Disney assures and causes the meltdown.

556.  S.G.'s disorders also cause her to have to experience certain Disney attractions repetitively.  S.G. is a "repeat rider."  This is a propensity common among autistic persons – a variety of the need for consistency, order and routine.  S.G. will experience a particular ride or attraction, such as Thunder Mountain, over and over, for several hours at a time.  Disney personnel are very familiar with the repeat rider type of guest.

557.  Disney's new DAS prevents S.G. from experiencing the full enjoyment of Disney's Parks.  Her experience is innately inadequate and unequal in comparison to the experience of Disney's non-disabled guests.

558.  Prior to October 2013, S.M.G. telephoned Disney on at least three separate occasions, each time leaving a voice message explaining the hardship the then anticipated new DAS card would cause to S.G. and her.  Disney: (1) failed to return any of the messages; and (2) failed to modify the policy for the needs of S.G. and others like her.  Instead, having notice of how this would affect S.G., Disney launched the DAS anyway.

559.   As a result of Disney's refusal to consider modified procedures which would accommodate S.G.'s needs and allow S.G. to have an equal experience at the Parks in comparison to non-disabled persons, S.M.G. reasonably canceled her family's trip to Walt Disney World in December 2013.

560.   S.G. has become so deterred by Disney's behavior that this September 2014, the Sunshine Foundation makes S.G. eligible for a trip to Disney but S.M.G. asked them for an alternative because of Disney's failure to grant S.G. accommodations that would allow S.G. to have an equally good time as a nondisabled person at the Disney Parks.

561.   Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate S.G.'s special needs, Disney implemented a policy that fails to accommodate the needs of S.G. and other guests like her, and has refused to modify it.

562.   Disney personnel showed no willingness or desire to improve the experience for guests like S.G.

563.   S.G. and S.M.G. have already visited the Parks considerably less frequently than they intended, a situation which continues to this day. Their interest in attending Disney Parks is substantially reduced. S.M.G. knows that attending Walt Disney World in the future will again be a supremely un-accommodating experience, one which would be destructive for S.G. She cannot tolerate another un-enchanting experience for S.G.

**WHEREFORE**, Plaintiff S.G., by and through S.M.G. as her next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of S.G.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

## <u>COUNT 50</u>

### Violation of the Americans with Disabilities Act
### 42 U.S.C. §§12131, *et seq.*
### *J.B. v. Disney*

564.   Plaintiff J.B. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

DOGALI LAW GROUP, P.A.

565. J.B. has misophonia, obsessive-compulsive disorder (OCD), and post-traumatic stress disorder.

566. J.B. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

567. J.B. is 17 years of age and is generally in the care of her mother, K.B, who brings this action as J.B.'s next friend, parent and natural guardian.

568. J.B. and K.B. are residents of Sarasota County, Florida.

569. Year after year, J.B., along with K.B. and her now deceased father, visited the Disney Parks.  During those visits, J.B. exhibited a nature and extent of joy that she rarely showed in any other setting.  K.B was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which she rarely showed elsewhere.

570. Because of these fond memories, J.B. and K.B. chose to move from New York to Florida and become annual Walt Disney World passholders in November 2013.

571. Since she was approximately 13 years old, J.B.'s cognitive impairments have manifested themselves in a certain way during her visits to the Parks; J.B. is incapable of standing in lines without her misophonia causing her to stare-down people and curse at them in a similar way to a patient with Tourette syndrome.  Triggers will cause J.B. to curse, break into a rash, cry, rage, and engage in self-mutilation, for example digging her nails into her skin until she bleeds.  J.B.'s triggers are largely gum chewing noises, water bottle crackling, chip bag crinkling, and sniffling, all of which are common occurrences in Disney's ride lines.

572. J.B.'s obsessive compulsive disorder causes her to have to experience the Disney Park rides in a certain order according to her ritual of going to the right on the Disney Park map.  At Magic Kingdom, J.B. is capable only of experiencing the Buzz Lightyear ride first, then the Space

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.,* case no. 14-2530

Mountain ride, etc.

573. Disney's new DAS prevents J.B. from experiencing the full enjoyment of Disney's Parks.  Her experience is innately inadequate and unequal in comparison to the experience of Disney's non-disabled guests.

574. In order to experience the facilities and services of Disney Parks since the implementation of the DAS, J.B. is now forced to stand in a line at City Hall to have her photograph taken and a Disability Access Service card made for her, enduring all potential triggers in the process.

575.  Similarly, each time J.B. wants to experience a Disney Park she is forced to wait around amongst trigger after trigger for return times on each ride which limits the order in which she can experience the rides.

576. The DAS card is only good for approximately two weeks, despite the fact that J.B.'s diagnosis will not change and her annual pass is good for twelve months.  The expiration of the DAS card after approximately two weeks assures that at practically every visit, J.B has to stand in line to receive a new DAS card and be subject to the potential triggers.

577. On or about December 2013, K.B. was so desperate for J.B. to avoid the Disney lines, that even though she is a Florida resident within driving distance of Disney Parks, she booked a room at a Disney property just to get the Magic Bands.  For K.B., the Magic Bands held the potential for her daughter to experience the rides in the order she needed, without exposing her to the long lines which are fraught with triggers.

578. However, when K.B. tried to schedule rides through her magic band privileges,  she learned that all the prime ride times fill up months in advance and the only times available were "off peak," such as 10:00 p.m.  The Magic Bands were worthless for J.B.'s purposes.

579. Since Defendant's implementation of the DAS, J.B. and K.B. have visited multiple Disney Entertainment sites, including the following Disney

DOGALI LAW GROUP, P.A.

Page 158

Parks:  Epcot; Magic Kingdom; and Hollywood Studios.  At each Park, K.B. has complained to various managers.

580.  In December 2013, K.B complained to a manager at Epcot about the way in which the new DAS card system caused J.B. to be subjected to a volume of triggers at Disney Parks to which the old system did not expose her.

581.  The Manager at Epcot walked J.B. and K.B. over to a ride and approved J.B. going to the front of the line.  The Manager said he was providing a "one-time only accommodation."

582.  The new procedure triggers J.B. more frequently at the Parks. Additionally, providing an accommodation only one time will not allow J.B. to utilize her annual pass in such a way that it provides the equal enjoyment of the Disney Parks as that of a non-disabled person.  By definition, a "one-time only accommodation" is not a modification of Disney's procedures.

583.  Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate J.B.'s special needs, Disney personnel have offered bizarre and preposterous responses to K.B's recitations regarding J.B.'s needs.  Their statements have been so contrary to Disney's body of knowledge and to Disney's historic performance that Disney cannot have accidentally created such absurdities.

584.  Disney personnel have shown no willingness or desire to improve the experience for guests like J.B.

585.  K.B incurred monetary costs in purchasing annual pass tickets to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

586.  J.B. and K.B have already visited the Parks considerably less frequently than they intended to when they purchased the annual passes, a situation which continues to this day.   Their interest in attending Disney Parks is substantially reduced.  K.B. knows that attending Walt Disney World in the future will again be a supremely un-accommodating experience, one which would be destructive for J.B. She cannot tolerate another un-enchanting experience for J.B.

**WHEREFORE**, Plaintiff J.B., by and through K.B as her next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of J.B.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

COMPLAINT
*A.L., by and through D.L, et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Such other relief as this Court may find just and equitable.

## COUNT 51

### Negligent Infliction of Emotional Distress

### *J.B. v. Disney*

587. Plaintiff J.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 565 through 586 above.

588. During one or more visits to the Parks, J.B. suffered an actual meltdown.

589. The symptoms and conditions associated with J.B.'s meltdown constitute a physical injury under Florida law.

590. J.B.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.B. during her patronage of Disney's facilities.  At all material times, Disney knew J.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

591. J.B.'s meltdown and the treatment which proximately caused J.B. to experience the meltdown caused her grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff J.B., by and through K.B. as J.B.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon J.B.; and

- Finding such infliction to have caused damages to J.B.; and
- Entering judgment for Plaintiff J.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 52

### Intentional Infliction of Emotional Distress

### *J.B. v. Disney*

592. Plaintiff J.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 565 through 586 above.

593. During one or more visits to the Parks, J.B. suffered an actual meltdown.

594. The symptoms and conditions associated with J.B.'s meltdown constitute a physical injury under Florida law.

595. J.B.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of J.B. during her patronage of Disney's facilities.  At all material times, Disney knew J.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

596. J.B.'s meltdown and the treatment which proximately caused J.B. to experience the meltdown caused her grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

DOGALI LAW GROUP, P.A.

DOGALI LAW GROUP, P.A.

**WHEREFORE**, Plaintiff J.B., by and through K.B. as J.B.'s next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon J.B.; and
- Finding such infliction to have caused damages to J.B.; and
- Entering judgment for Plaintiff J.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 53
### Breach of Contract
### *K.B v. Disney*

597.  Plaintiff K.B incorporates and re-alleges the allegations of paragraphs 1 through 66, and 565 through 586 above.

598.  K.B, through K.B's acquisition of Disney annual passes for K.B and her family, entered into a contract through which Disney promised to provide a reasonable and enjoyable amusement park experience, and one which complies with applicable law.

599.  Disney failed or refused to provide the promised experience, and is in breach of contract.

600.  K.B incurred monetary costs in purchasing annual passes to the Parks for trips that were entirely wasted, and incurred other expenses during the wasted trips to the Parks.  Plaintiff is damaged by Disney's breach of

contract.

**WHEREFORE**, Plaintiff K.B prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney breached its contract with K.B; and
- Entering judgment for Plaintiff K.B in the amount of her economic monetary damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

<div align="center">

**COUNT 54**

**Negligent Infliction of Emotional Distress**

***K.B. v. Disney***

</div>

601. Plaintiff K.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 565 through 586 above.

602. During one or more visits to the Parks, K.B.'s beloved daughter J.B. suffered an actual meltdown while in K.B.'s presence.

603. The symptoms and conditions associated with J.B.'s meltdown constitute a physical injury to J.B. under Florida law.

604. J.B.'s meltdown in the Parks was proximately caused by Disney's negligent, unlawful, reckless and arbitrary treatment of J.B. during her patronage of Disney's facilities.  At all material times, Disney knew J.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

605. K.B. directly observed the stressors leading up to the meltdown, J.B.'s resulting escalation and her meltdown.  Particularly in light of

DOGALI LAW GROUP, P.A.

her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her daughter, K.B. could do nothing reasonable to prevent the meltdown.

606. K.B.'s observation of J.B.'s meltdown and of the outrageous conduct and treatment which proximately caused J.B. to experience the meltdown caused K.B. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff K.B. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney negligently inflicted emotional distress upon K.B.; and
- Finding such infliction to have caused damages to K.B.; and
- Entering judgment for Plaintiff K.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

## COUNT 55
### Intentional Infliction of Emotional Distress
### *K.B. v. Disney*

607. Plaintiff K.B. incorporates and re-alleges the allegations of paragraphs 1 through 66, and 565 through 586 above.

608. During one or more visits to the Parks, K.B.'s beloved daughter J.B. suffered an actual meltdown.

DOGALI LAW GROUP, P.A.

609. The symptoms and conditions associated with J.B.'s meltdown constitute a physical injury under Florida law.

610. J.B.'s meltdown in the Parks was proximately caused by Disney's outrageous, unlawful and reckless treatment of J.B. during her patronage of Disney's facilities.  At all material times, Disney knew J.B. to be vulnerable to emotional injury if treated in such a manner by anyone.

611. K.B. directly observed the stressors leading up to the meltdown, J.B.'s resulting escalation and her meltdown.  Particularly in light of her trust and confidence that Disney would comply with applicable law and act in a gracious and caring manner toward her daughter, K.B. could do nothing reasonable to prevent the meltdown.

612. K.B.'s observation of J.B.'s meltdown and of the outrageous conduct and treatment which proximately caused J.B. to experience the meltdown caused K.B. grave and extreme mental anguish and emotional trauma, for which Disney should be held accountable.

**WHEREFORE**, Plaintiff K.B. prays that this Court adjudicate this dispute and enter an Order:

- Finding that Disney intentionally inflicted emotional distress upon K.B.; and
- Finding such infliction to have caused damages to K.B.; and
- Entering judgment for Plaintiff K.B. in the amount of such damages; and
- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and
- Awarding prejudgment interest; and
- Such other relief as this Court may find just and equitable.

**COUNT 56**

**Violation of the Americans with Disabilities Act**

**42 U.S.C. §§12131, *et seq.***

***S.H. v. Disney***

613. Plaintiff S.H. incorporates and re-alleges paragraphs 1 through 66, and 68 above.

614. S.H. has Angelman syndrome, a neuro-genetic disorder manifesting in severe intellectual and developmental disability.  Though she is 17 years of age, her intellectual and social development appears akin to that of a toddler.  She displays many traits common to persons with autism and other cognitive impairments.  She is nonverbal, and is prone to extreme reactions to stimuli or events which strike her as arbitrary, unpredicted, inconsistent or inexplicable.  In such situations she will scream as loudly as she can while flailing her arms wildly and while slamming herself into and against her adaptive stroller.

615. S.H. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

616. S.H. is generally in the care of her mother, T.R., who brings this action as S.H.'s next friend, parent, and natural guardian.

617. S.H. and T.R. are residents of Butte County, California.

618. S.H. first visited one of the Parks, Disneyland, when she was five years old.  The experience was a magical one, the most extraordinary experience which T.R. had ever seen for S.H.  From that time, the family returned to Disneyland about annually, until 2008.

619. On each visit to the Parks, S.H. was admirably accommodated.  T.R. became completely appreciative of the experience, and of Disney's caring treatment for her daughter, because their Disney visits were

DOGALI LAW GROUP, P.A.

the only occasions – including visits to other theme parks – on which S.H. appeared to be able to experience the same joyful and pleasurable experiences that other, non-disabled children could.

620. S.H.'s time in the Parks was so magical for S.H. that, in 2008, the family purchased season passes for the first time, and began visiting Disneyland much more frequently than annually.  In addition to the season passes for the five members of their family, T.R. also purchased annual passes for an additional adult.  Because T.R. and her family lived an eight-hour drive from Disneyland, they customarily made multi-day trips to the Parks.   Along with the annual passes, the cost of such vacations could become exorbitant. T.R. could not imagine losing the magical experience for S.H., and knew she needed to make arrangements to permanently afford regular excursions to the Parks.

621. In 2008, in light of Disney's astonishing capacity for accommodation toward S.H., T.R. acquired an interest in the Disney Vacation Club Florida. T.R.'s confidence was unshakable that Disney's caring accommodations would be just as magical at Walt Disney World as they had always been at Disneyland.

622. The family continued to visit Disneyland, and, in about 2009, purchased a further interest in Disney Vacation Club, this time toward the Disneyland Resort.   The family supplemented that purchase by acquiring an additional interest in Disney Vacation Club California in 2010.  In total, T.R. has invested more than $40,000.00 into the Disney Vacation Club, in exchange for Disney's promise to provide caring and impeccable accommodations, for 50 years.  T.R. rested assured that she had been able to arrange to afford that magic

DOGALI LAW GROUP, P.A.

1    and accommodation for S.H., for 50 years, until well into S.H.'s

2    advanced years.

3    623.  In June 2010, S.H. and T.R. and their family visited Walt Disney

4    World for the first time.  They took two more vacations to Walt

5    Disney World, the first in December and January, 2012 to 2013, the

6    second in June 2013.

7    624.  On each of the family's above-described visits, before Disney's

8    Disability Access Service was released in October, 2013, S.H. carried

9    the card associated with the Guest Assistance Card service, and she

10   was admirably accommodated.  During those visits, S.H. exhibited a

11   nature and extent of joy that she rarely showed in any other setting.

12   T.R. was always proud and joyful of the opportunity to bring to her

13   beloved daughter a level of happiness which she rarely showed

14   elsewhere.

15   625.  During those visits, T.R. was enamored by the way Disney employees

16   accommodated S.H., making her feel exceptional and accepted.

17   Disney had strong mechanisms in place to ensure S.H. and T.R. were

18   accommodated in an expedient manner.  The Guest Assistance Card

19   made wait times manageable for S.H.

20   626.  The Guest Assistance Card and program also allowed T.R. to predict

21   the accommodations which would be afforded to S.H.  She could

22   confidently commit the family's resources to a planned vacation to

23   the Parks.  For S.H. and T.R., before the DAS system, a large part of

24   the Magic was *the accommodation itself*.  S.H. was always treated

25   with care and respect, and was not subjected to discrimination.

26   627.  Before October 2013, a typical visit to the Parks for S.H. and T.R. was

27   a magical experience.  Upon arriving at Guest Relations at Magic

28   Kingdom or Disneyland, S.H. received the Guest Assistance Card,

COMPLAINT
*A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc.*, case no. 14-2530

DOGALI LAW GROUP, P.A.

without an extended wait and without having her picture taken. After entering the Parks, wait times were reasonable and S.H. was never stigmatized.   S.H. and T.R. traveled the parks at a pace comfortable to S.H.  A great benefit of the Guest Assistance Card was that it prevented a problem which was unseemly but unfortunately common in other parks or public places of entertainment.   Quite frequently, non-disabled guests in such venues will pick up their pace or even run toward the entrance to an attraction simply to avoid being behind S.H. in the queue.   The family never had to witness the spectacle in the Parks, because S.H. was permitted to enter rides in the Fast Pass line or the wheelchair line, without visiting the queues.

628.  As is true of many persons with cognitive impairments, S.H. has little concept of time, including past or future.   S.H. is incapable of understanding the idea of waiting for something, or delayed gratification, two important requirements for surviving a Disney queue.

629.  S.H. is incapable of comprehending the experience of trekking to a ride only to be told she cannot ride it.  In that situation, S.H. will experience an involuntary reaction similar to that known as a meltdown in the autistic community.

630.  Even though S.H. and T.R. have not visited the parks since the DAS was implemented, T.R. knows the DAS requirement to travel to a ride only to be turned back and told to come back later will be intolerable for S.H., because of prior, proven experience within the Parks.

631.  In 2012, Disney opened a new attraction in Disney's California Adventure known as Radiator Springs Racers.  The ride opened to

DOGALI LAW GROUP, P.A.

typical wait times of many hours, an aspect of the ride which would render the ride wholly inaccessible for persons with cognitive impairments.   For persons carrying the Guest Assistance Card, Disney occasionally implemented a system similar to the Disability Access Service.  On these occasions, when a person carrying the GAC approached the ride, he or she would be told that they would be given an assigned time, written on their GAC, at which they could come back and go on the ride.

632.  When Disney subjected S.H. to this situation the first time, S.H. began screaming and yelling as loud as she could, flailing wildly and uncontrollably.  The reaction was so uncontrollable that, on future visits, the family took steps to avoid taking S.H. all the way to Radiator Springs Racers without first confirming that S.H. would be permitted to enter the attraction upon arrival.

633.  Undoubtedly, Disney witnessed many disabled visitors who exhibited, in response to DAS-like rejection at Radiator Springs Racers, the same reaction as S.H.  Even so, Disney instituted this unaccommodating system through all the Parks.

634.  At about the time Disney rolled out the DAS, T.R. started hearing and learning about the experiences of other similarly-situated families. Persons with developmental disorders were uniformly suffering awful experiences in the Parks.  Their families were making their newfound disdain for the DAS widely known.

635.  To gain more information and to cooperate with Disney's anticipated efforts to accommodate S.H.'s special needs, T.R. called Disney to discuss the issues.  T.R. was given no new information about the DAS, but was simply told the family would be expected to follow it.

DOGALI LAW GROUP, P.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOGALI LAW GROUP, P.A.

If T.R. had any concerns about the adequacy of the DAS, she could raise them upon entrance to the Parks.

636. The Disney representative with whom T.R. spoke offered one explanation for Disney's abandonment of its prior policy of accommodating persons with cognitive impairments. She said Disney's accommodating GAC system had been "severely abused." Until hearing news accounts of "abuse" at about the time Disney rolled out the DAS, T.R. had never heard any stories or suggestions that such "abuse" of Disney's accommodations was occurring.

637. S.H. and T.R. have not visited the Parks at Disneyland since February 2013, or the Parks at Walt Disney World since June 2013. At present, T.R. knows they should avoid attending the Parks in the future because the experience will be an un-accommodating one and due especially to the risk that the experience will be destructive for S.H.

638. Despite this deep parental fear, T.R. is conflicted because she knows S.H. has adored Disney her entire life, and the adoration never abated during the time Disney, through its Guest Assistance Card system, actually accommodated persons with cognitive impairments.

639. T.R. is also conflicted because she invested more than $40,000.00 in the Disney Vacation Club, toward which she also continues to pay annual dues. She made this investment and paid these dues with absolute confidence that Disney would caringly accommodate S.H. as Disney always had, and that Disney would continue to do so for 50 years.

640. T.R. and S.H.'s visits to the Parks have already tapered, and will continue to do so in the absence of a meaningful restoration of

Page 172

Disney's commitment to accommodate the special needs of persons with developmental disorders.

**WHEREFORE**, Plaintiff S.H., by and through T.R. as his next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of S.H.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

DOGALI LAW GROUP, P.A.

## Count 57

### Violation of the Unruh Civil Rights Act

### California Civil Code §§51, 52

### *S.H. v. Disney*

641.  S.H. incorporates and re-alleges paragraphs 1 through 68, and 614 through 640 above.

642.  S.H. is and at all material times has been a disabled person within the meaning of California Government Code 12926(j).

643.  Section 51 of the California Civil Code, the Unruh Civil Rights Act, provides protection from discrimination by all business establishments in California, including housing and public accommodations, because of age, ancestry, color, disability, national origin, race, religion, sex and sexual orientation.

644.  Section 52 of the California Civil Code provides that whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 is liable for each and every offense.

645.  Pursuant to California Civil Code Section 51(f), a violation of the ADA also constitutes a violation of California Civil Code Section 51, *et seq.*

646.  The Parks are "business establishments" within the meaning of the California Code Section 51, *et seq.*

647.  Through the acts and omissions described in this Complaint, Disney has violated California Civil Code Section 51 by denying Plaintiff S.H.'s access to Disney's programs, services and activities.   Disney has instituted and continues to utilize policies which deny or which aid or incite the denial of Plaintiff's full and equal enjoyment of Disney's public accommodations in the same manner as non-disabled persons. Disney refuses to modify its policies and procedures to permit fair

1    enjoyment of its facilities by Plaintiff.  As a direct and proximate result
2    of the afore-mentioned acts and omissions, Plaintiff has suffered, and
3    continues to suffer, hardship, humiliation and anxiety due to Disney's
4    failure to provide reasonable accommodations and access as are
5    required by Plaintiff's developmental disorders and cognitive
6    impairments.

648.   Due to the continuous nature of Disney's ongoing discriminatory
conduct, declaratory and injunctive relief are appropriate.  Moreover,
as a result of Defendant's action, Plaintiff is suffering irreparable harm,
and thus immediate relief is appropriate.

**WHEREFORE**, Plaintiffs S.H. prays that this Court adjudicate this dispute
and enter an Order:

- Enjoining Defendant to cease the practices which are causing
  discrimination against Plaintiffs on account of S.H.'s disability;
  and

- Enjoining Defendant to reasonably modify its policies, practices,
  and procedures to afford Plaintiffs with an opportunity to
  experience Disney's goods, services, facilities, privileges,
  advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must
  implement, to prevent Disney from further discriminating against
  Plaintiffs when they visit the Disney Parks; and

- Establishing Court-approved requirements for information
  dissemination about Disney's remedial measures and modified
  policies, to prevent Disney from further deterring Plaintiffs from
  visiting Disney Parks as a result of anticipated discrimination;
  and

- Establishing a monitoring program to ensure Disney's compliance

DOGALI LAW GROUP, P.A.

with the Court's Orders; and

- Entering judgment for Plaintiff S.H. in the amount of his non-economic monetary damages; and

- Entering judgment in favor of Plaintiffs and against Disney for exemplary or punitive damages; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiffs and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiffs and against Disney; and

- Such other relief as this Court may find just and equitable.

Dated:  April 3, 2014

 _/s/ Eugene Feldman_
EUGENE FELDMAN
California Bar No. 118497
gfeldmanlaw@att.net
Eugene Feldman, Attorney at Law, APC
555 Pier Avenue, Suite 4
Hermosa Beach, CA 90254
Tel:  (310) 372-4636
Fax:  (310) 372-4639


ANDY DOGALI
_Pro Hac Vice to be submitted_
adogali@dogalilaw.com
Dogali Law Group, P.A.
101 E. Kennedy Blvd., Suite 1100
Tampa, Florida  33602
Tel:   (813) 289-0700
Fax:   (813) 289-9435
_Attorneys for Plaintiffs_

COMPLAINT
_A.L., by and through D.L., et al. v. Walt Disney Parks & Resorts US, Inc._, case no. 14-2530

DOGALI LAW GROUP, P.A.